UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------x

DOUGLAS KINSEY,

                    Plaintiff,                    04 Civ. 0582

        v.                                        O P I N I O N

CENDANT CORPORATION, FAIRFIELD
RESORTS INC., and FFD DEVELOPMENT
COMPANY, L.L.C.,

                    Defendants.

---------------------------------------x

A P P E A R A N C E S:

            Attorneys for Plaintiff

            CROWELL & MORING LLP
            153 East 53d Street, 31st Floor
            New York, NY  10022
            By:  Jeffrey W. Pagano, Esq.
                 Ira M. Saxe, Esq.

            Attorneys for Defendant

            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
            Four Times Square
            New York, NY  10036-6522
            By:  Samuel Kadet, Esq.
                 Timothy K. Giordano, Esq.

**Sweet, D.J.**

The defendants Cendant Corporation ("Cendant"),
Fairfield Resorts Inc. ("Fairfield") and FFD Development
Company, L.L.C. ("FFD") (collectively the "Defendants")
have moved pursuant to Rule 56, Fed. R. Civ. P. to dismiss
Counts 2, 9 and 10 of the Amended Complaint of plaintiff,
Douglas Kinsey ("Kinsey" or the "Plaintiff"). Upon the
findings and conclusions set forth below, the motion is
granted.

Kinsey, an employee of Fairfield, then FFD, and
then Fairfield again, seeks to enforce his rights to stock
options which the Defendants assert have expired. The
resolution of Kinsey's rights requires a review of the
granting documents and Kinsey's employment history.
Understandable confusion resulting from corporate
reorganization has been replaced by careful scrutiny by the
Defendants in part as a consequence of Kinsey's acceptance
of employment by one of Fairfield's competitors.

## Prior Proceedings

Kinsey commenced this action on January 26, 2004. In his initial complaint (the "Original Complaint") against Fairfield, FFD, Cendant and the Cendant Corporation Employee Stock Purchase Plan (collectively, the "Initial Defendants"), Kinsey alleged that the Plan and Option Agreement constituted an employee benefit plan governed by ERISA and that, in connection with certain options awarded to Kinsey under a Fairfield Stock Option Plan (the "Options"), the Initial Defendants violated Kinsey's rights, breached their fiduciary duties and interfered with "protected rights," all supposedly in violation of the Employee Retirement Income Security Act (collectively, the "ERISA Claims"). He also asserted a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and various common law claims concerning the Options, as well as a state law claim against the Initial Defendants for their purported failure to pay Kinsey for accrued, unused vacation benefits to which he was allegedly entitled to upon his resignation from Fairfield.

The Initial Defendants moved to dismiss the Original Complaint on March 26, 2004, including the ERISA Claims and the claim for securities fraud. Rather than respond to that motion, Kinsey filed the Amended Complaint, in which he abandoned, inter alia, the ERISA Claims and dropped the Cendant Employee Stock Purchase Plan as a defendant. The Amended Complaint, however, retained a claim for securities fraud and various common law and state law claims.

On May 10, 2004, Defendants moved to dismiss the majority of the claims in the Amended Complaint, including the claims for securities fraud (Count 1), breach of fiduciary duty (Count 3), breach of implied duty of good faith and fair dealing (Count 4), fraud and deceit (Count 5), and unjust enrichment (Count 8). Defendants also moved to dismiss the negligence claim (Count 7) to the extent that claim was based on gross negligence.

In an Opinion and Order issued on November 16, 2004 the Court granted Defendants' motion in full, dismissing Counts 1, 3, 4, 5 and 8 of the Amended Complaint and Count 7 in part. See Kinsey v. Cendant Corp., No. 04 Civ. 0582, 2004 WL 2591946, at *19 (S.D.N.Y. Nov. 16,

2004). Pursuant to Rule 15(a), the Court also granted Kinsey leave to move to file a second amended complaint.

On December 16, 2004, Kinsey moved for leave to file a second amended complaint, which attempted to revive three of the claims that did not survive Defendants' motion to dismiss, specifically claims for breach of fiduciary duty, fraud and deceit, and gross negligence. The Court denied Kinsey's motion for leave to amend, finding that amendment would be futile because the proposed claims still failed as a matter of law.

The remaining claims are (i) breach of contract, alleging breach of the Fairfield Stock Option Plan (the "Plan") under which the Options were awarded to Kinsey (Count 2); (ii) negligence and negligent misrepresentations, alleged to be erroneous advice Kinsey claims to have received regarding the time within which he was required to exercise the Options (Counts 5 and 6); (iii) failure to pay wages (vacation benefits) (Count 9); and (iv) declaratory judgment, in which Kinsey seeks a declaration that he exercise the Options at any time through and including May 21, 2007 (Count 10).

Kinsey seeks to recover damages related to the Options issued to him in 1997 under the Plan, as well as damages related to certain other stock options issued under other stock option plans, namely: (i) the value of 33,334 Cendant stock options, issued to Kinsey in 2001 under a Cendant option plan, and (ii) the value of 16,000 stock options granted to Kinsey in January 2002 under a Cendant option plan which were vested at the time Kinsey resigned from Fairfield in 2003, but were "underwater" (i.e., the strike price was above the market price of Cendant common stock) during the three-month time period within which Kinsey could exercise those options after his resignation (the "2002 Options") and in Count 9 of the Amended Complaint, Kinsey seeks to recover accrued, unused vacation benefits to which Kinsey claimed he was entitled upon resignation from Fairfield. The parties have completed fact discovery and the instant motion was heard and marked fully submitted on May 23, 2007.

## The Facts

The facts are obtained from the Defendant's Local Civil Rule 56.1 Statement ("Def. Statement") and Kinsey's

Response and Statement ("Plaintiff Response") and are not in dispute except as noted below.

Kinsey is a former at-will employee of both Fairfield and FFD and holds a degree in finance. At the time of his resignation from Fairfield in 2003, Kinsey held the position of Senior Vice President of Real Estate Acquisitions. In that position, Kinsey was responsible for significant acquisition and development projects valued at hundreds of millions of dollars, which were expected to result in net sales revenue for Fairfield somewhere in the billion-dollar range.

Fairfield is a vacation timeshare ownership company. In April 2001, Cendant acquired Fairfield (the "Merger"). In connection with the Merger, FFD was created to acquire property for Fairfield to develop.

Effective March 7, 1997, Fairfield established the 1997 Stock Option Plan (the "Plan"). The Plan authorized the Fairfield Board of Directors (the "Board") or its compensation committee to make discretionary awards to employees of options to purchase shares of Fairfield common stock. Specifically, the Plan states:

> Grants of Stock Options. The Compensation Committee or the Board may from time to time authorize grants to any Participants of Stock Options upon such terms and conditions as such committee or the Board, as applicable, may determine in accordance with the provisions set forth below.

The Plan defines "Stock Option" as "the right to purchase a share of Common Stock upon exercise of an option granted pursuant to Paragraph 5."

Under the Plan, any award of options would specify the required period of continuous employment and any other conditions to be satisfied before the awarded options would become exercisable, and an award could also provide for, or be amended to provide for, the earlier exercise of options in the event of a change in control of Fairfield. Specifically, the Plan stated in a section titled "Grants of Stock Options":

> (e) Each grant will specify the required period or periods (if any) of continuous service by the Participant with the Company or any Subsidiary and/or any other conditions to be satisfied before the Stock Options or installments thereof will become exercisable, and any grant may provide, or may be amended to provide, for the earlier exercise of the Stock Options in the event of a change in control of the Company (as

8

defined in the stock option agreement evidencing such grant or in any agreement referred to in such stock option agreement) or in the event of any other similar transaction or event.

Under the Plan, each award of options was to be evidenced by a stock option agreement executed on behalf of Fairfield and delivered to the recipient employee. Specifically, the Plan states in a section titled "Grants of Stock Options":

(g) Each grant will be evidenced by a stock option agreement executed on behalf of the Company by the Chief Executive Officer (or another officer designated by the Compensation Committee or the Board, as applicable) and delivered to the Participant and containing such further terms and provisions, consistent with the Plan, as such committee or the Board, as applicable, may approve.

The Plan authorized the Board (or the compensation committee), without the consent of the recipient employee, to amend any agreement evidencing a stock option granted under the Plan, or otherwise take action, to accelerate the time or times at which the options may be exercised and to extend the expiration date of the options. The Plan states, in a section termed "Amendments, Etc.," that:

9

(a) The Compensation Committee or the Board, as applicable, may, without the consent of the Participant, amend any agreement evidencing a Stock Option granted under the Plan, or otherwise take action, to accelerate the time or times at which the Stock Option may be exercised, to extend the expiration date of the Stock Option, to waive any other condition or restriction applicable to such Stock Option or to the exercise of such Stock Option, to reduce the exercise price such Stock Option, to amend the definition of a change in control of the Company (if such a definition is contained in such agreement) to expand the events that would result in a change in control of the company and to add a change in control provision to such agreement (if such provision is not contained in such agreement) and may amend any such agreement in and any other respect with the consent of the Participant.

The Plan could also be terminated at any time. The termination of the Plan will not adversely affect the terms of any outstanding Stock Option.

Pursuant to the Plan, on May 22, 1997, Kinsey was granted certain stock options (the "Awarded Options"). The Option Agreement set forth the terms and conditions of the grant of the Awarded Options, and the grant by Fairfield was acknowledged and accepted by Kinsey.

A copy of the Plan was appended to the Option Agreement received and signed by Kinsey. Arkansas law applied to all terms and conditions of the Option

10

Agreement, except as to matters of corporate law. The Option Agreement stated as follows:

> 9. This Agreement is intended to be construed and enforced in accordance with, and governed by, the laws of Arkansas, except as to matters of corporate law, which will be governed by the laws of the State of Delaware.

A copy of the Plan was appended to the Option Agreement received and signed by Kinsey. FFD is not a party to the Option Agreement. The Option Agreement provided that "effective as of the Date of Grant [Fairfield] grants to [Kinsey] an Option pursuant to the Plan to purchase 10,000 shares of Common Stock at a price equal to $30.00 per share . . . ."

Under the Option Agreement, the Awarded Options were to vest (i.e., become exercisable) at a rate of 25% on each of the second, third, and fourth and fifth anniversaries of the date of the award, provided that Kinsey remained in continuous employment with Fairfield from the award date until each such vesting date.

The Option Agreement stated as follows:

2. This Option shall become exercisable to the extent of 25% of the shares hereinabove specified on each of the second, third, fourth and fifth anniversary dates of the Date of Grant; provided, that, the Participant has remained in continuous service from and after the Date of Grant as, and is, on such anniversary date, an employee of FCI or its Subsidiary. To the extent exercisable, this Option may be exercised in whole or in part from time to time, subject to the time limitations set forth in paragraph 4 below.

Following the grant of the Awarded Options, Fairfield announced two stock splits, a 3-for-2 split effective July 15, 1997 and a 2-for-1 split effective January 30, 1998. Neither amendment changed the time within which Kinsey was entitled to exercise the Awarded Options.

In April 2001, Cendant assumed outstanding and unexercised options issued pursuant to the Plan, and, in conjunction with the Merger, options issued pursuant to the Plan, including Kinsey's, automatically became fully vested and were converted to options to purchase shares of Cendant common stock. Under the applicable conversion factor, Kinsey's Awarded Options became fully-vested options to purchase 33,918 shares of Cendant common stock at a "strike" price of $8.85 per share. Kinsey received notice of this conversion in a Statement of Stock Option Award,

12

which explained that the newly-converted options remained subject to the terms and conditions set forth in the Plan and Option Agreement.

The notice of conversion and Statement of Stock Option Award states:

It is important you note that each of your newly converted Cendant options remains subject to the terms of the applicable Fairfield stock option plan pursuant to which it was granted, as well as the original grant agreement provided to you by Fairfield, with the exception that your option is now exercisable into Cendant common stock (and has been adjusted as discussed above). This means that the original expiration date of your options will continue to apply, as will the terms and conditions applicable to your options upon your separation from employment with Cendant and/or Fiarfield.

FFD, a Delaware limited liability company with its principal place of business in Florida, was formed in connection with the Merger as a separate and distinct legal entity. Kinsey accepted employment with FFD at or around the time of the Merger.

In March 2000, in contemplation of the Merger, Fairfield had amended the Plan by extending the time period in which participants -- such as Kinsey -- who were

13

terminated from Fairfield in order to become employed by
FFD could exercise their stock options (the "Amendment").

The Officer's Certificate states, in part:

NOW, THEREFORE, BE IT RESOLVED, that, effective
at the Effective Time, each Stock Option (as
defined in the 1997 Stock Plan) granted under the
Company's 1997 Stock Plan which is outstanding at
the Effective Time will be adjusted so that (a)
the Stock Option will be exercisable for shares
of common stock, $.01 par value per share, of
Cendant designated as CD Common Stock ("CD Common
Shares"), (b) the number of CD Common Shares
issuable upon exercise of the Stock Option will
be equal to the product of (i) the number of
shares of common stock, $.01 par value per share,
of the Company subject to the Stock Option
immediately prior to the Effective Time
multiplied by (ii) the Exchange Ratio (as defined
in the Merger Agreement), rounded down to the
nearest whole number of CD Common Shares, (c) the
Option Price (as defined in the 1997 Stock Plan)
will be equal to the quotient of (i) the Option
Price in effect immediately prior to the
Effective Time divided by (ii) the Exchange
Ratio, rounded up to the nearest whole cent, (d)
if the Stock Option is held by a Participant who
is an active employee of the Company or any of
its Subsidiaries immediately before the Effective
Time, the Stock Option will become fully vested
(to the extent not already vested) immediately
prior to the Effective Time and remain
exercisable in accordance with its existing
terms, and (e) if the Participant's employment
with the Company or Cendant or any of their
respective Subsidiaries is terminated in
connection with the Participant becoming employed
by FFD Development Company, LLC or its
Subsidiaries, the period during which the
Participant may exercise the Stock Option after
the Participant's employment with the Company or

14

Cendant or any of their respective Subsidiaries has been terminated will be the longer of the period set forth in the related option agreement or the date that is one year after the date during which the Effective Time occurred; provided, however, if the Participant's employment with FFD Development Company, LLC or its Subsidiaries is terminated voluntarily by the Participant, the period during which the Stock Option will be exercisable will be the period stated in the related option agreement commencing from the date the Participant's employment with FFD Development Company, LLC or its Subsidiaries was terminated.

As a result of the Amendment, the period during which FFD employees such as Kinsey would be able to exercise their options upon termination from Fairfield would be the longer of (i) the exercise period set forth in the applicable option agreement's provision governing termination of employment from Fairfield (in Kinsey's case, 90 days), or (ii) April 1, 2002 (the date that is one year from the effective date of the Merger).

Kinsey did not exercise his Awarded Options by April 1, 2002, and according to the Defendants they expired that day in accordance with the terms of the Plan and Option Agreement, as amended.

15

Kinsey resigned from Fairfield on or about May 9, 2003. He was not asked to leave Fairfield and resigned even though, according to Kinsey, the Chief Executive Officer of Fairfield was encouraging him to stay with the company.

On or around May 12, 2003, Kinsey commenced employment at Bluegreen Corp. ("Bluegreen"), one of Fairfield's competitors. Kinsey had begun negotiating the terms and conditions of his employment with Bluegreen in January or February 2003. Upon commencement of employment with Bluegreen, Kinsey's cash compensation package included $260,000 base and a discretionary bonus of up to $130,000, making his total cash compensation package $390,000. Kinsey testified that when he left Fairfield in May 2003 his total cash compensation package was $300,000.

Since joining Bluegreen, Kinsey has been the fourth highest paid executive at the company, which has a market capitalization of approximately $600 million. Kinsey has been awarded stock options in connection with his employment at Bluegreen. Kinsey remains employed with Bluegreen. Kinsey received a check from the State of Florida in October 2006 representing payment for accrued,

unused vacation benefits that Kinsey claimed he was entitled to upon resignation from Fairfield in 2003. According to Kinsey, by virtue of an unexplained deduction in pay, the check did not include all the pay to which Kinsey is entitled.

Kinsey seeks to recover damages related to the Awarded Options issued to him in 1997 under the Plan and damages related to other unrelated stock options, namely (i) the value of 33,334 Cendant stock options, issued to Kinsey in 2001 under a Cendant option plan, that were unvested at the time Kinsey resigned from Fairfield in 2003 (the "2001 Options"), and (ii) the value of 16,000 stock options granted to Kinsey in January 2002 under a Cendant option plan which were vested at the time Kinsey resigned from Fairfield in 2003, but were "underwater" (i.e., the strike price was above the market price of Cendant common stock) during the three-month time period within which Kinsey could exercise those options after his resignation (the "2002 Options").

Under the applicable Cendant option plan, 16,666 of the 2001 Options would have vested in October 2003, had Kinsey remained employed at Fairfield. Assuming continued

17

employment at Fairfield, the other 16,666 would have vested in October 2004. 16,666 of the total number of options that Kinsey received in 2001 were vested at the time he resigned, and Kinsey thereafter exercised those vested options at a profit. Kinsey does not seek any damages related to these 16,666 options. 8,000 of the total number of options Kinsey received in 2002 were vested at the time Kinsey resigned, and subject to a one-year exercise period following his resignation. Kinsey exercised those 8,000 options at a profit during the applicable one-year exercise period, and Kinsey does not seek any damages related to them.

Kinsey has stated additional facts which follow.

Management of Fairfield, FFD and Cendant did not advise Kinsey at any time within one year after the acquisition of Fairfield by Cendant that his stock options would expire in less than ten years.

An April 8, 2003 email from Matt Durfee ("Durfee"), Senior Vice President of Human Resources, to Steve Holmes stated that since the acquisition Kinsey "had been working for us uninterrupted either at Fairfield or

18

DevCo." According to Kinsey, Defendants considered Kinsey's move from Fairfield to FFD on or about April 2, 2001 to be a transfer, not a termination of employment from Fairfield based upon a May 6, 2003 email from Durfee to Holmes, personnel action forms, dated April 2, 2001 and Durfee testimony. All of Kinsey's Fairfield seniority dates were maintained when he transferred to FFD, except, Defendants contend, the applicable dates in connection with the exercise of his stock options. The Fairfield Human Resources Department maintained, for at least the remainder of 2001, personnel files for the employees that transferred from Fairfield to FFD on or about April 2, 2001. Fairfield, through Durfee, and other Fairfield human resources executives, provided human resources assistance in relation to the formation of FFD. FFD did not have an individual in charge of the human resources function. Employees of FFD remained covered by Cendant for employee benefits for a substantial period of time. Kinsey did not experience any gap in employee benefits, such as health insurance, 401(k) benefits or the like, when he transferred from Fairfield to FFD. No COBRA letter was issued to him in connection therewith.

Cendant and Fairfield developed a retention plan as an incentive to Fairfield employees to remain employed after the closing of the acquisition of Fairfield by Cendant. Fairfield offered Kinsey participation in this retention plan, and in a December 5, 2000 letter from James Berk, President and Chief Executive Officer of Fairfield, to Kinsey advised him as follows: "[a]wards will be paid approximately 90 days after the acquisition close date and you must be a current employee at that time." Fairfield paid Kinsey the retention bonus after the expiration of the April, May and June 2001 period. Franz Hanning ("Hanning"), President and Chief Executive Officer of Fairfield after Berk, advised Kinsey, in a July 2, 2001 letter to him, that the "check signifies our appreciation for your dedication over the last 3 months" and "emphasized[d] the importance of your contribution going forward as we explore new opportunities, create new synergies, and continue to grow as part of the Cendant family of companies."

In 2002, FFD was recognized by Defendants as being part of Cendant. According to Kinsey, when he transferred back to Fairfield from FFD, his offer letter indicated a preservation of his benefits which he

understood was to include his stock options according to
the April 8, 2003 email from Durfee.

Roe Sie ("Sie"), Director of Compensation and
Benefits for Fairfield, has acknowledged that Kinsey was
not aware that his Awarded Options were said to expire
until February 26, 2003, more than one year after the
acquisition of Fairfield by Cendant.    In or about June
2001, Cendant sent a notice to Kinsey informing him that
his stock options would expire on or about June 30, 2001,
ninety days after the acquisition.

On or about July 3, 2001, Defendants informed
Kinsey that the notice that his stock options would expire
on June 30, 2001 was sent to Kinsey in error and by email
from Greg Bendlin ("Bendlin"), Senior Vice President-Legal
for FFD stated that the stock options of former Fairfield
employees who became FFD employees, including Kinsey, had
not expired and that, as part of the merger, Fairfield's
Board of Directors and Compensation Committee amended the
1997  Stock  Option  Plan  "to  provide  that  continued
employment at FFD would count as continued employment under
the option plan and the 90 day exercise period would not
apply  once  the  optionees  were  no  longer  Fairfield

employees." Bendlin made no mention of any one-year period and that "continued employment at FFD would count as continued employment under the" Plan. Durfee stated that "this is one case we would recommend making an effort to keep Doug whole." And at the request of Durfee, calculations were made to determine the value of Kinsey's Awarded Options.

Keller, a Fairfield employee who received stock options under the Plan and transferred to FFD upon Cendant's acquisition of Fairfield, similarly situated to Kinsey in that regard, was allowed to exercise his stock options more than one year after his transfer to FFD. Meisner notified Kinsey that he was "the only one in this situation, so please do not speak to other Devco employees."

On or about August 13, 2001, Bendlin advised Kinsey, by email, that Kinsey's and Keller's options had "not expired because of the special provisions made for the Fairfield employees (Brian and Doug) who transferred to FFD," and in so doing re-transmitted his July 3, 2001 email advising Kinsey that "continued employment at FFD would count as continued employment under the" Plan.

22

Kinsey unsuccessfully sought the assistance of Hanning in relation to his Awarded Options, advised him that he was never informed that his stock options would expire in less than ten years. Kinsey asked Hanning for further information regarding the matter; Hanning responded, in words or substance, that it looks like the company screwed Kinsey.

On or about April 9, 2003, Kinsey sent an email to Richard Meisner ("Meisner"), a senior counsel in the Cendant Law Department, with copies to Hanning and other officers and/or executives of Defendants, stating that Defendants' written representations to him confirmed that he had until May 2007 to exercise his stock options, and Defendants never communicated to him that his options would expire. Kinsey again asked for any purported Stock Option Plan amendments, or any notices concerning expiration of his options.

According to Kinsey, he was treated in a threatening, abusive, and offensive manner as a result of the pursuit of his right to exercise his stock options, creating intimidating, hostile and intolerable working

23

conditions. On April 9, 2003, Meisner denied Kinsey's requests, stated that Kinsey's options were absolutely and finally expired and that Kinsey's appeal was denied. Meisner warned Kinsey that Meisner would defend Cendant's interests and that Cendant, Fairfield and FFD denied Kinsey's assertions and reserved all rights. Meisner advised Kinsey to retain his own counsel. Meisner admonished Kinsey that there was "quite a bit of senior management brainpower" being spent on his situation so, "for your benefit, follow my lead."

On April 17, 2003, over a year after his options were said to have expired, Defendants, through Meisner, informed Kinsey that "the information [he was] provided" in relation to the treatment of employment FFD as continued employment with Fairfield "was not entirely correct."

According to Kinsey, he did not want to resign from his employment at Fairfield, but he was compelled to do so as a result of the unilateral elimination of his Awarded Options by Defendants, and Defendants' retaliatory response to his efforts to reverse that unilateral elimination.

24

Kinsey advised Defendants of the reasons for his resignation from employment, both verbally and in his May 7, 2003 email to Tom Anderson, as follows:

This email should confirm our conversation of May 5th.

Unfortunately, due to the unilateral elimination of my stock options and the total lack of response to my requests that the situation be addressed, I feel that I have no reasonable alternative except to resign my position as Sr. Vice President of Real Estate Acquisitions for Fairfield Resorts. To leave Fairfield is very distressing for me. However, I feel that I have been forced into this position and have no other alternative. I will be available on my cell phone if you have any questions.

Kinsey received options to purchase 50,000 shares of Cendant stock upon his transfer back to Fairfield in or about October 2001. One third of those options, or 16,666 shares, vested during the period of Kinsey's employment with Fairfield. Had Kinsey remained employed at Fairfield, options to purchase another 16,666 shares would have vested in or about October 2003 and options to purchase another 16,666 shares would have vested in or about October 2004.

Kinsey did not receive any paychecks from Fairfield in May 2003. He did not receive his final

25

Fairfield paycheck until November 2006, from the Florida Department of Financial Services which contained an unexplained, unauthorized deduction of 72 hours of pay.

## Summary Judgment Standard

In deciding a motion for summary judgment, a court shall render judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).

The moving party has the initial burden of showing that there are no material facts in dispute, Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970), and can discharge this burden by demonstrating that there is an absence of evidence to support the nonmoving party's case, Celotex, 477 U.S. at 325. The nonmoving party then must come forward with "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), as to

26

every element "essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

The court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1187 (2d Cir. 1987); see also Eastway Constr. Corp. v. New York, 762 F.2d 243, 249 (2d Cir. 1985). However, the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If there is not, summary judgment is proper. See id. at 249-50.

## The Breach of Contract Claim is Dismissed

In Count 2 of the Amended Complaint ("Breach of Contract"), Kinsey has alleged that Defendants breached the Plan and Option Agreement by failing to allow Kinsey to exercise the Awarded Options after April 1, 2002. (Amended Complaint, ¶¶ 88-94). In order to prevail on such a claim, Kinsey must establish the essential element of "breach."

See, e.g., Marimba Prods., Inc. v. Demorrow, No. CA94-2, 1995 WL 264356, at *1 (Ark. Ct. App. May 3, 1995) (to prevail on a breach of contract claim, a plaintiff must establish "breach" of a contractual obligation). The Option Agreement provides that it is to be governed by Arkansas law, except as to matters of corporate law, which are to be governed by Delaware law.

Under the Option Agreement, as long as Kinsey remained employed by Fairfield, he could exercise any of the Awarded Options that had vested up to ten years after the May 22, 1997 award date. However, if Kinsey ceased to be an employee of Fairfield, he could exercise vested Awarded Options only during the ninety calendar days following the termination of his employment. The Option Agreement further provided that any subsequent amendment to the Plan would be deemed an amendment to the Option Agreement.

In April 2001, as a result of the Merger, the Awarded Options became fully vested and were converted to options to purchase 33,918 shares of Cendant common stock at a "strike" price of $8.85 per share. Kinsey received notice of this conversion in a Statement of Stock Option

Award, which explicitly stated that "the original expiration date of [the] options will continue to apply, as well as the terms and conditions applicable to [the] options upon your separation of employment with Cendant or Fairfield."

In connection with the Merger, Kinsey, who had been employed by Fairfield, became an employee of FFD and began working for FFD on or around April 1, 2002, the effective date of the Merger. This termination of his employment from Fairfield would have triggered the 90-day expiration period for the exercise of the Awarded Options, pursuant to the Plan and Option Agreement. However, in contemplation of the Merger, the Compensation Committee of the Fairfield Board of Directors amended the Plan in order to extend the time period in which participants who were terminated from Fairfield in connection with becoming employed by FFD, such as Kinsey, could exercise their stock options post-termination.

Pursuant to this Amendment, new FFD employees like Kinsey would be able to exercise their options issued under the Plan during one of two following periods, whichever was longer: (i) the exercise period set forth in

the applicable option agreement's provision governing termination of employment from Fairfield -- under Kinsey's Option Agreement, 90 days, or (ii) the period up to and including April 1, 2002 -- the date that was one year from the effective date of the Merger. Since Kinsey became employed by FFD in April 2001, the longer of these two periods for Kinsey was the latter, and thus under the Plan, as amended, Kinsey had until April 1, 2002 to exercise the Awarded Options.

Finally, whether Kinsey was negligently advised, as he contends, that his rights were other than as set forth in the Plan and Option Agreement, as amended, the resolution of his breach of contract claim necessarily rests on the actual terms of the Plan and Option Agreement. In this motion, the factual disputes as to what Kinsey was advised in respect of the time period within which he was required to exercise his Awarded Options post-termination in connection with the claims for negligence can appropriately be resolved at trial.

Where, as here, an application of the undisputed facts to the plain terms of a contract establishes that there has been no breach, summary judgment is both

appropriate and warranted. See e.g., First Investors Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168-69 (2d Cir. 1988) (affirming grant of summary judgment on breach of contract claim where there was no evidence contract had been breached); Lind v. Vanguard Offset Printers, Inc., 857 F. Supp. 1060, 1066 (S.D.N.Y. 1994) (granting summary judgment on breach of contract claim where there was no "factual basis" demonstrating that the contract had been breached).

The Awarded Options were issued to Kinsey under a Fairfield plan, and FFD was not a party to, and did not assume, the Plan or Option Agreement. Summary judgment in respect of defendant FFD is warranted for this additional, independent reason. See, e.g., Rabalaias v. Barnett, 284 Ark. 527, 528-29 (1985) (in order to state claim for breach of contract, there must be "a valid and enforceable contract between the plaintiff and defendant") (quoting Williams v. Black Lumber Co., 275 Ark. 144 (1982)); Marimba Prods., 1995 WL 264356, at *1.

In his opposition, Kinsey has contended that the Plan and Option Agreement are "ambiguous" with respect to the time to exercise the Amended Option.

Kinsey, however, does not identify any supposed ambiguity much less attempt to offer any explanation as to how or why Defendants' plain reading of the Plan and Option Agreement is incorrect, and fails to offer an alternative interpretation of his own. Kinsey has declared in conclusory fashion that an (unidentified) ambiguity is "inherent" and "readily observed" from the "text of the applicable provisions." (Pl. Mem. At 7).

However, unsupported conclusions are insufficient to defeat summary judgment. See, e.g., Scott v. Gardner, No. 02 Civ. 8963, 2006 WL 2481645, at *5 (S.D.N.Y. Aug. 25, 2006); Diaz v. TMC Servs., 451 F. Supp. 2d 566, 574 (S.D.N.Y. 2006) (holding that on summary judgment, "the nonmoving party must present concrete particulars and cannot succeed with purely conclusory allegations") (citation and internal quotation marks omitted); Zeigler v. Marriott Int'l, Inc., No. 03 Civ. 7688, 2005 WL 1022431, at *7 (S.D.N.Y. May 2, 2005) ("The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts").

In <u>Jones v. Bank of Am., N.A.</u>, 311 F. Supp. 2d
828 (D. Ariz. 2003), the plaintiff sued his former employer
for breach of contract and negligent misrepresentation
after plaintiff attempted to exercise certain stock
options, but was not permitted to do so. <u>Id.</u> at 832.

In granting defendant's motion for summary
judgment, the court rejected a conclusory declaration of
"ambiguity":

> Plaintiff makes unsupported allegations of
> ambiguity. That Plaintiff thinks the terms of
> the [plan and option agreement are] ambiguous
> does not make it so. He does not set forth
> specific facts showing there is a genuine issue
> for trial.

<u>Id.</u> at 835 (internal quotation marks omitted).

Kinsey's conclusory allegations of "ambiguity"
are insufficient to defeat summary judgment. <u>See</u> <u>Big E.</u>
<u>Entm't, Inc. v. Zomba Enters., Inc.</u>, 453 F. Supp. 2d 788,
794 (S.D.N.Y. 2006) ("A party opposing summary judgment
cannot demonstrate the existence of a genuine issue of
material fact merely with conclusory denials of the moving
party's allegations.").

33

Kinsey's primary position is that a jury could conclude that the Awarded Options did not expire one year after the Acquisition, notwithstanding the terms of the Amendment, because Bendlin told him that employment at FFD would "count" as continued employment at Fairfield and, thus, that the "original expiration date" of his Awarded Options (May 21, 2007) continued to apply even though Kinsey's employment with Fairfield had been terminated, and he had accepted employment at FFD, in April 2001. (Mem. 6-7; 10)

However, where a contract is unambiguous, extrinsic evidence is inadmissible to alter its terms. See, e.g., Gomez v. Local 144, Hotel, Hosp., Nursing Home and Allied Services Union Staff Pension Plan, No. 95 Civ. 5755,1995 WL 731628, at *3 (S.D.N.Y. Dec. 11, 1995) ("Extrinsic evidence . . . is not admissible where a contract is unambiguous."); Saxon v. Blann, No. 89-3089, 1991 WL 350748, at *14 (W.D. Ark. Jan. 25, 1991) ("[T]he court is obligated to apply the plain meaning of a contract without regard to the parole [sic] evidence available."), aff'd, 968 F.2d 676 (8th Cir. 1992); Int'l Klafter Co. v. Cont. Cas. Co., 869 F.2d 96, 100 (2d Cir. 1989) ("[A] fundamental principle of contract interpretation [is] that,

in the absence of ambiguity . . . no parol evidence or extrinsic evidence is admissible."). Thus, the factual dispute on which Kinsey relies, while relevant to Kinsey's negligence claims, is irrelevant to his breach of contract claim. Cf. Anderson, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

The plaintiff in Jones sought to defeat summary judgment on his breach of contract claim by arguing that he received "assurances" from company officials that the original expiration date of his stock options would continue to apply, despite his termination and provisions in the plan documents unambiguously providing for a 90-day exercise period upon termination. See Jones, 311 F. Supp. 2d at 834-35. The court rejected this argument, aptly explaining that:

> This conflicting evidence [over whether officials in fact gave such assurances to plaintiff] presents a disputed fact in this case. However, it is not a material fact because regardless of what [the officials] told or did not tell Plaintiff, he is still bound by the terms of the [option agreement, which is] clear as to the

terms under which Plaintiff could have exercised his options, irrespective of any information given him by [company officials].

Id.

Whether or not Kinsey was advised, as he contends, that his rights were other than as set forth in the Plan and Option Agreement, as amended, the resolution of his breach of contract claim rests on the terms of the Plan and Option Agreement. See id.; see also Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano, No. 03 Civ. 0015, 2004 WL 1406076, at *7 (S.D.N.Y. June 23, 2004) (subsequent information provided to plaintiff regarding a license agreement "cannot alter the plain language of the 1996 License Term"); cf. Relational Funding Corp. v. TCIM Servs., Inc., No. Civ. A. 01-821-SLR, 2003 WL 21037627, at *2 (D. Del. April 29, 2003) (holding that "additional evidence does not change the plain language of the [contract]").

Kinsey has also referred to Brian Keller, an employee whom Kinsey has contended was permitted to exercise his options more than one year after the Acquisition, despite being "similarly situated to Kinsey in

36

all material aspects." (Mem. At 3, 10) Defendants'
purported "course of conduct" in respect of a single,
different employee also is inadmissible extrinsic evidence
that as a matter of law is insufficient to alter the terms
of the Plan and Option Agreement. See, e.g., Int'l Klafter
Co., 869 F.2d at 100 ("[A]ny conceptions or understandings
any of the parties may have had during the duration of the
contracts is immaterial and inadmissible. Since the
language of the contracts is unambiguous, there is no need
here to examine the conduct of the parties over the
intervening years to ascertain their intent.") (citation
and internal quotation marks omitted); Singh v. Riley's,
Inc., 878 S.W.2d 422, 424 (Ark. Ct. App. 1994) (holding
that "parol evidence is admissible only if an ambiguity
exists").

To the extent Kinsey has sought to rely on such
evidence in an attempt to establish that the Plan and
Option Agreement, as amended, was ambiguous, "extrinsic
evidence may not be used to create an ambiguity." NYSA-ILA
Med. & Clinical Servs. Fund v. Golten Marine Co., Inc., No.
91 Civ. 4707, 1994 WL 800706, at *5 (S.D.N.Y Dec. 31, 1994)
(quoting Consarc Corp. v. Marine Midland Bank, N.A., 996
F.2d 568, 573 (2d Cir. 1993)); see also Bangkok Crafts,

37

2004 WL 1406076, at *7 (collecting cases); Estate of Denton v. Garrich, No. CA 04-860, 2005 WL 768753, at *2 (Ark. Ct. App. Apr. 6, 2005) ("[W]e do not allow the admission of extrinsic or parol evidence in order to create an ambiguity.").

Kinsey has also contended that it is "fiction" that his employment with Fairfield "terminated" when he became an employee of FFD in April 2001, the Amendment did not apply to him, and that "it is undisputed that Kinsey was employed by Fairfield in April 2002, when the Awarded Options allegedly expired." It is undisputed that, following his employment with FFD, Kinsey was subsequently rehired by Fairfield and, thus, was an employee of Fairfield when the Awarded Options expired in April 2002. His status as a Fairfield employee in 2002 has nothing to do with whether Kinsey was previously terminated from Fairfield in April 2001 when he accepted employment at FFD.

In his Rule 56.1 statement, Kinsey contends that Defendants "considered" his "move to FFD" in April 2001 to be a "transfer," not a "termination" of employment from Fairfield. However, Kinsey signed an offer letter, on FFD letterhead, accepting employment with FFD in April 2001,

which is at odds with the suggestion that he was merely "transferred" there.

Even if Kinsey was "transferred" to FFD in April 2001, that does not establish that his employment with Fairfield was not "terminated" upon that transfer. In the Amended Complaint, Kinsey alleged that after becoming an FFD employee in April 2001, he thereafter engaged in "negotiations . . . pursuant to which he would become employed again by Fairfield." When Kinsey returned to Fairfield following his employment with FFD, he signed an employment "offer" letter (on Fairfield letterhead) confirming that Kinsey would "join" Fairfield beginning on October 8, 2001. The contention by Kinsey that he was "transferred," not "terminated," is rejected as semantic and insufficient to create a genuine issue of material fact. See Wards Co., Inc. v. Stamford Ridgeway Assocs., 761 F.2d 117, 120 (2d Cir. 1985) ("Contorted semanticism must not be permitted to create an issue where none exists"); Simes v. Furman, 703 F. Supp. 7, 9 (S.D.N.Y. 1988).

## The Declaratory Judgment Claim is Dismissed

Count 10 of the Amended Complaint seeks a
declaratory judgment that Kinsey is entitled to exercise
his Awarded Options until May 21, 2007. (Amended
Complaint, ¶¶ 148-52). As concluded above, the Awarded
Options expired in April 2002 under the terms of the Plan
and Option Agreement on which Kinsey's claim for
declaratory judgment is based. Accordingly, Kinsey's claim
for declaratory judgment necessarily fails. See EZ
Rolloffs, LLC v. Hermitage Ins. Co., No. 03 Civ. 5564, 2005
WL 984347, at *5 n.11 (D. Minn. Apr. 27, 2005) ("Because
there was no breach of contract, plaintiff's claim for a
declaratory judgment must fail as well."); Charles v. First
Unum Life Ins. Co., No. 02 Civ. 0748E(F), 2004 WL 963907,
at *3 (W.D.N.Y. Mar. 26, 2004) (granting summary judgment
dismissing claims for breach of contract and declaratory
judgment on the same grounds).

## The Failure to Pay Wages Claim is Dismissed

Kinsey testified during his deposition that he
received a check for the vacation benefits that he sought
to recover in his failure to pay wages claim, and that

those claimed damages were therefore "off the table." (Kinsey Dep. at 98) In his opposition papers, Kinsey has claimed that the check "did not provide him with all the pay to which he was entitled" and has contended that an unspecified "deduction" reflected in the check was "unexplained" and "unjustified." (Pl. Mem. 13-14).

Kinsey, however, has failed to identify the additional amount to which he is purportedly entitled. No genuine issue of material fact warranting a trial has been established. See, e.g., Diaz, 451 F. Supp. 2d at 574 ("On a motion for summary judgment, the nonmoving party must present concrete particulars and cannot succeed with purely conclusory allegations.") (citation and internal quotation marks omitted); United States v. 0.35 Of Acre of Land, 706 F. Supp. 1064, 1069 (S.D.N.Y. 1988); Zeigler, 2005 WL 1022431, at *7 ("The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts . . . .") (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir.1990)) (internal quotation marks omitted). The Defendants have noted that Kinsey received a paycheck from Fairfield dated May 23, 2003 (a Friday), even though he had resigned on or about May 9, 2003 (a Friday) and commenced

41

employment at his new job (at Bluegreen) on May 12, 2003 (a Monday). (See Giordano Reply Declaration). The record therefore suggests that the "deduction" about which Kinsey complains was proper in light of a previous overpayment to Kinsey, incorporated into the check he received on May 23.

In the absence of any material facts in dispute, the failure to pay pages claim is dismissed.

## The Other Claimed Damages Are Dismissed

Kinsey's Other Claimed Damages are based on the 2001 and 2002 Options, i.e., options other than the Awarded Options that form the predicate of his breach of contract and negligence claims.

Kinsey has contended that, if his breach of contract claim is not dismissed, then the Other Claimed Damages would be recoverable as "consequential damages" for breach of the Plan and Option Agreement. (Pl. Mem. at 15-16). However, consequential damages cannot be recovered unless they were "fairly within the contemplation of the parties." See e.g., Dawson v. Temps Plus, Inc., 337 Ark. 247, 258 (1999). To seek to satisfy this standard, Kinsey

42

has offered the declaration that "[t]he losses" suffered by Kinsey "are reasonably within the contemplation of Defendants."

The Awarded Options were granted to Kinsey under the Plan and Option Agreement in 1997, years before Kinsey was granted the 2001 and 2002 Options under different option plans and pursuant to different option agreements. (See Def. Mem. at 12) Accordingly, because the 2001 and 2002 Options did not even exist at the time of the 1997 Plan and Option Agreement, damages based on the 2001 and 2002 Options could not possibly have been contemplated by Defendants in the event of a breach of the 1997 Plan and Option Agreement. As such, no such damages can be recovered. See Dawson, 337 Ark. at 258; see also Tevdorachvili v. Chase Manhattan Bank, 103 F. Supp. 2d 632, 641 (E.D.N.Y. 2000).

Kinsey has asserted that his recoverable "losses" include "the other options" he left behind due to a "forced resignation" and that he was "constructively discharged." (Pl. Mem. at 16-18). However, the Amended Complaint does not contain a claim for constructive discharge. Moreover, Kinsey testified that (1) he was never asked to leave

43

Fairfield, and (2) notwithstanding the dispute over the Awarded Options, the Chief Executive Officer of Fairfield "was suggesting to me [Kinsey], almost encouraging me to stay with the company . . ." (Kinsey Dep. at 243-45). Kinsey has contended that he was "forced to resign" as a result of "Defendants' retaliation" against him for challenging the determination that his Awarded Options had expired. (Pl. Mem. 18) However, this statement is not supported by any purportedly "retaliatory" act that allegedly left him with no choice but to resign. Cf. Uddin v. City of New York, 427 F. Supp. 2d 414, 434 (S.D.N.Y. 2006); Scott, 2006 WL 2481645, at *5; Randolph v. CIBC World Markets, No. 01 Civ. 11589, 2005 WL 704804, at *13 (S.D.N.Y. March 29, 2005) (granting summary judgment on discriminatory discharge claim because "[c]onclusory allegations [of discrimination] are insufficient to survive a motion for summary judgment").

In the absence of evidence constituting retaliation, Kinsey's resignation to take a higher paying job as one of the top four executives at a competitor does not support a loss of the unvested 201 Options and the "underwater" 2002 Options. See e.g., Treasure Lake Assoc. v. Oppenheim, 993 F. Supp. 217, 220 (S.D.N.Y. 1998)

(granting summary judgment as to damages and observing that
"[i]n order to be entitled to an award of damages, the
plaintiff must demonstrate with certainty that such damages
were caused by the actions of defendants"), aff'd, 165 F.3d
15 (2d Cir. 1998).

Even if there had never been any dispute
concerning the Awarded Options -- and Kinsey had not
elected to terminate his employment with Fairfield when he
did -- Kinsey could have been terminated at any time.
Accordingly, there simply can be no certainty as to whether
Kinsey would have remained employed by Fairfield long
enough for the 2001 Options to vest pursuant to their
vesting schedule and/or for the 2002 Options to be "in the
money" such that Kinsey could have exercised them at a
profit. As one court explained in a similar situation, the
sort of damages Kinsey seeks are therefore too
"speculative" to recover:

    Damages for anticipated lost salary are
    inappropriate where employment is at will. Even
    if [plaintiff] had accepted the brokerage
    position, he could have been terminated the next
    day. [Thus,] he cannot establish he would have
    received the salary he contends he forfeited in
    reliance on [defendant's] promises.

45

Allied Vista, Inc. v. Holt, 987 S.W.2d 138, 142 (Tex. Ct. App. 1999). Kinsey's claimed damages based on the 2001 and 2002 Options are also rejected as too speculative. See id.; see also StoreRunner Network, Inc. v. CBS Corp., 8 A.D.3d 127, 128 (N.Y. App. Div. 2004) (affirming summary judgment where claim for damages was "unduly speculative"). Since the claimed negligence relates only to the Awarded Options and has nothing to do with the 2001 and 2002 Options, the Other Claimed Damages are dismissed.

## Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted and the breach of contract and declaratory judgment claims are dismissed as well as claims relating to the 2001 and 2002 Options.

It is so ordered.

**New York, NY**
**November $\mathcal{5}^{\frown}$, 2007**

ROBERT W. SWEET
U.S.D.J.

46