**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
DOUGLAS KINSEY,                              :
                                :   <u>**Document Electronically Filed**</u>
               Plaintiff,     :
                                :   Case No. 1:04-cv-00582-RWS
        v.                                    :
                                  :   (ECF CASE)
CENDANT CORPORATION, FAIRFIELD               :
RESORTS INC., and FFD DEVELOPMENT            :
COMPANY, L.L.C.,                             :
                                  :
                                  :
               Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE**

Samuel Kadet
samuel.kadet@skadden.com
Lauren E. Aguiar
lauren.aguiar@skadden.com
Sarah Heckman Yardeni
sarah.yardeni@skadden.com
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000

Attorneys for FFD Development Company, L.L.C.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................................ii

PRELIMINARY STATEMENT .......................................................................... 1

ARGUMENT ...................................................................................................... 2

I.　　Kinsey Fails To Articulate a Valid Reason To Introduce Evidence Pertaining to
　　　Mr. Keller's Options .................................................................................. 2

II.　 Kinsey Should Not Be Permitted To Base His Alleged Damages on Wholly
　　　Speculative and Subjective Evidence......................................................... 3

CONCLUSION ................................................................................................... 7

# TABLE OF AUTHORITIES

## CASES

**Page**

Commonwealth Associates v. Palomar Medical Technologies, Inc.,
   982 F. Supp. 205 (S.D.N.Y. 1997) ....................................................................5

Halifax Fund v. MRV Communications, Inc.,
   No. 00 CIV 4878 HB, 2001 WL 1622261 (S.D.N.Y. Dec. 18, 2001)............................4, 5

Scalp & Blade Inc. v. Advest, Inc.,
   309 A.D.2d 219, 765 N.Y.S.2d 95 (4th Dep't 2003) .........................................................3

Schultz v. Commodity Futures Trading Commission,
   716 F.2d 136 (2d Cir. 1983) ................................................................... 1, 4, 5, 6

Wey v. New York Stock Exchange, Inc.,
   15 Misc. 3d 1127(A), 841 N.Y.S.2d 222 (Sup. Ct. N.Y. County 2007)
   (table decision, text available at 2007 WL 1238596) ................................................3, 5, 6

Defendant FFD Development Company, L.L.C. ("FFD"), respectfully submits this Reply Memorandum of Law in Further Support of its Motion <u>In Limine</u> ("Motion").  For the following reasons, as well as those set forth in FFD's Memorandum of Law in Support of the Motion ("FFD Mem."), the Motion should be granted in all respects.

## <u>PRELIMINARY STATEMENT</u>

Kinsey's Opposition to FFD's Motion ("Opp.") fails to articulate a valid reason why the Court should permit Kinsey to introduce at trial (i) evidence regarding an unrelated third party, Brian Keller and his Cendant stock options; or (ii) Kinsey's speculative and subjective assertion regarding the price at which he would have sold the Cendant stock he would have acquired through a timely exercise of his own Options.[1]  Specifically, Kinsey has not -- because he cannot -- explain why evidence regarding Keller and Keller's options has any bearing on any of the legal elements Kinsey must prove to establish his remaining claims.  Further, Kinsey's theory about how damages should be calculated reflects a fundamental misunderstanding of basic damages methodology.  In recovering for the lost value of stock, a party is not permitted (as Kinsey is attempting to do here) to recover based on his subjective assertion of what could have happened <u>years</u> after the alleged wrongdoing, but must be limited to a value within a reasonable time period -- the precise measure urged by FFD.

---

[1]     Abbreviated terms shall have the same meaning as set forth in FFD's opening brief.

## ARGUMENT

**I.    Kinsey Fails To Articulate a Valid Reason To
       Introduce Evidence Pertaining to Mr. Keller's Options**

Kinsey makes the sweeping conclusion that evidence regarding Mr. Keller's situation "will assist [him] in meeting [his] burden" (Opp. at 6) -- but Kinsey then fails to explain how that is the case.[2]  In the five pages that Kinsey devotes to this argument, nowhere does he offer a logical reason why this evidence is relevant to the narrow issues left to be decided at trial. While Kinsey attempts to distinguish FFD's cases on their facts (Opp. at 5-6), these cases simply stand for the uncontroverted proposition that evidence unrelated to any element of a claim is irrelevant and must be excluded.  Moreover, Kinsey cites not one case in support of his affirmative argument that the evidence regarding Keller's options is relevant to some element of his remaining claims.

Kinsey dwells on the notion that he and Keller were similarly situated in all respects except that Keller was allowed to exercise his options after their purported expiration date of April 1, 2002 but Kinsey was not.  (Opp. at 7-8.)  Kinsey does not explain how these facts, even if true, would be relevant to any element of his remaining claims, nor does he show any link between Mr. Bendlin's purportedly negligent statements to Kinsey and Keller's exercise of his options.[3]

---

[2]    Kinsey's selective quoting of Mr. McConnell's deposition testimony explaining that he (Mr. McConnell) could not speculate as to why Keller was allowed to exercise his stock options, while Kinsey was not, is irrelevant.  (Opp. at 4.)  Indeed, the reason Mr. McConnell could not offer any explanation is that he had no responsibility for Kinsey's or Keller's options, since all such options were the responsibility of Cendant Corporation.  (McConnell Dep. at 56:22-57:20 (Saxe Opp. Decl. Ex. A); see also id. at 20:17-24.)

[3]    As FFD explained in its opening brief, Kinsey could not have relied on information relating to Keller's options in failing to exercise his own Options because Kinsey did not know what had happened with respect to Keller's options until 2003, nearly a year after Kinsey's Options expired.  (FFD Mem. at 5.)  Kinsey does not -- because he cannot -- dispute this point.

Lastly, Kinsey complains that FFD failed to argue that evidence of Keller's exercise of his options would be prejudicial or inappropriate, but instead FFD claims that the evidence it seeks to exclude concerning Mr. Keller and his options is designed "to elicit the jury's sympathy in an inappropriate effort to excuse Kinsey." (Opp. at 8.) However, as FFD discussed in its opening brief, evidence pertaining to Mr. Keller and his options serves <u>no other purpose than</u> to prejudice FFD and mislead the jury. (FFD Mem. at 5-6 and cases cited therein.) Plainly, this is precisely the type of prejudice Rule 403 was designed to combat.

## II.   Kinsey Should Not Be Permitted To Base His Alleged Damages on Wholly Speculative and Subjective Evidence[4]

Kinsey asserts that he should be allowed to introduce evidence that had he known of the April 1, 2002 expiration date, he would have "converted his Cendant options and s[old] his Cendant stock when the stock price hit $23.75" per share in 2004 because he had somehow been able to predict that -- no matter what -- he was going to sell any such stock at that price. (Opp. at 9.) This position is without merit and is not a valid method to calculate damages in any context. As an initial matter, there is simply no way Kinsey could have known -- <u>years</u> in advance, according to his theory -- with any degree of certainty how Cendant's stock would perform. Further, Kinsey did not convey this alleged subjective intent to anyone (or he would be offering that evidence, as well), nor did he take advantage of any number of financial instruments to lock

---

[4]   Kinsey makes the specious assertion that FFD's motion <u>in limine</u> to exclude damages evidence is a summary judgment motion in disguise. (Opp. at 10.) However, FFD brings this motion <u>in limine</u>, pursuant to well established case law, to preclude Kinsey from introducing legally irrelevant and prejudicial evidence. In <u>Scalp & Blade, Inc. v. Advest, Inc.</u>, cited by Kinsey, the Appellate Division held that the movant was actually attempting to "'limit[] the legal theories . . . to be tried.'" 309 A.D.2d 219, 224, 765 N.Y.S.2d 95, 96 (4th Dep't 2003) (citation omitted). Here, FFD is not attempting to limit the legal theories to be tried (<u>i.e.</u>, the purpose of summary judgment), but requests that Kinsey be required to present only relevant evidence in support of his alleged damages. See <u>Wey v. N. Y. Stock Exch., Inc.</u>, 15 Misc. 3d 1127(A), 841 N.Y.S.2d 222 (Sup. Ct. N.Y. County 2007) (table decision), text available at 2007 WL 1238596, at *13 ("[A] motion in limine is the appropriate vehicle to determine what evidence may be presented at trial regarding damages.").

in that price (which he could have done even before exercising the Options). [5]  Finally, the fact

that he sold some Cendant stock, which he had acquired from exercising unrelated options, at

$23.75 per share in no way demonstrates that he necessarily would have sold all of his Cendant

stock holdings at that same price -- assuming he had timely exercised his Options and acquired

additional stock.  To the contrary, this "evidence" only demonstrates that for whatever reason,

Kinsey decided to liquidate some stock at that price or at that time; it has no bearing on what he

would have done with other stock had he acquired it.  Kinsey's attempt to use his financial

decision in 2004, in hindsight, to support an inflated damages theory should not be condoned.

        Kinsey maintains that his damages theory, based on wholly subjective and

speculative assertions, is supported by damages methodology purportedly used in "tort actions"

and which focus on "ma[king] good . . . the harm done by the wrongdoer."  (Opp. at 11-12.)

Accordingly Kinsey argues that he will only be "made good" by demonstrating that he would

have sold any stock he would have acquired had he timely exercised his Options at a price of his

sole choosing, even a stock price reached nearly 3 years after the alleged wrongdoing.  This

assertion is a mischaracterization of the law regarding proper damages calculations. [6]

---

[5]     Upon the April 1, 2001 Cendant-Fairfield merger, Kinsey's Options were fully vested and "in the money," and Kinsey offers no explanation for why he did not just exercise the Options, hold the liquid, marketable shares of Cendant stock he would have thereby acquired, and wait until the stock reached his "magic number" of $23.75 to sell.

[6]     Kinsey's assertion that FFD erroneously relied on the reasoning from cases involving damages for breach of contract is belied by the very authority he cites.  (See Opp. at 11.)  In his brief, Kinsey quotes from the rule established by the Second Circuit in Schultz, as that rule was re-quoted and applied in Halifax Fund v. MRV Communications, Inc., No. 00 CIV 4878 HB, 2001 WL 1622261, at *5 (S.D.N.Y. Dec. 18, 2001) (citing Schultz v. Commodity Futures Trading Commission, 716 F.2d 136, 139, 141 (2d Cir. 1983)).  Halifax Fund involved damages for a claim based on equitable estoppel in which Judge Baer applied the "Schultz rule" but noted that the rule is generally applied to breach of contract cases and further cited with approval a breach of contract case on which Kinsey also expressly relies.  Id. (citing Commonwealth Assocs. v. Palomar Med. Techs., 982 F. Supp. 205, 208 (S.D.N.Y. 1997)); (see Opp. Mem. at 12).  Indeed, Kinsey has been urging the same theory of damages since the inception of the case and never suggested that he would have -- or could have -- argued a different theory had his contract claim not been dismissed.  In all events, Kinsey's proposed damages evidence violates the bedrock principle that no matter whether a tort or breach of contract is asserted, in measuring damages, "reasonable certainty is always required."  Wey, 2007 WL 1238596, at *10.

It is beyond dispute that a plaintiff seeking damages based on the lost value of marketable securities should <u>not</u> be able to subjectively select as the basis of a damages claim the highest stock price at any time between the time of the alleged wrong and a trial.  <u>See</u> <u>Schultz v. Commodity Futures Trading Commission</u>, 716 F.2d 136, 140 (2d Cir. 1983).  The Second Circuit has articulated principles for determining such damages based on setting an "outer time limit of a reasonable period" during which an intermediary value of the stock can be determined to avoid the claimant from receiving a "windfall."  <u>Id.</u>  Contrary to Kinsey's assertion, a self-servingly selected stock value nearly three years in the future cannot serve as a basis for damages.  <u>See</u> <u>Wey v. N.Y. Stock Exch., Inc.</u>, 15 Misc. 3d 1127(A), 841 N.Y.S.2d 222 (Sup. Ct. N.Y. County 2007) (table decision), text available at 2007 WL 1238596, at *10-12 (dismissing negligent misrepresentation claim, and granting defendant's motion to limit damages evidence at trial on remaining claims, finding that plaintiff's suggested basis was grounded only on hindsight evidence, overly speculative, and required multiple assumptions) (<u>cited in</u> Opp. at 11).

Accordingly, applying these general principles, the cases cited by Kinsey actually support the conclusion that damages must be based on the stock price at the time of the alleged wrong or a reasonable period thereafter.  <u>See, e.g.</u>, <u>Halifax Fund v. MRV Commc'ns</u>, No. 00 CIV 4878 HB, 2001 WL 1622261, at *5 (S.D.N.Y. Dec. 18, 2001); <u>Commonwealth Assocs. v. Palomar Med. Techs.</u>, 982 F. Supp. 205, 210 (S.D.N.Y. 1997).[7]  Here, the relevant date on which to value the stock price is when Kinsey would have exercised the Options but for the alleged misrepresentation and not, as he suggests, his speculation about when, years into the future, he

---

[7]    While the principles underlying the "<u>Schultz</u> rule" undoubtedly apply here, and cut <u>against</u> Kinsey's proposed damages evidence, the formulation expressed by <u>Schultz</u>, which is based on measuring value at the time of a conversion of stock or when notice of that conversion was received, cannot be transposed exactly to these facts.  716 F.2d at 141.  Indeed, despite quoting the "<u>Schultz</u> rule," Kinsey does not even suggest that the mechanics of it are applicable here.  (Opp. at 11.)

would have subsequently disposed of any stock he would have thereby acquired.  See Schultz, 716 F.2d at 140 (the principles adopted by the court "alleviate the hardship occasioned by estimating damages at the highest intermediate value up to the time of trial, an event which might not take place until years after the transaction complained of . . . .").

      As explained in FFD's opening brief (at 6-7), Kinsey has conceded that he does not know when prior to the April 1, 2002 expiration date he would have exercised the Options, had he known the correct expiration date, but he would have done so prior to that expiration date. Accordingly, FFD's suggested basis for damages (if any) -- the average intermediary value of Cendant stock between August 14, 2001 (when Kinsey was allegedly misinformed concerning the correct expiration date) and April 1, 2002 (when the Options expired) -- is eminently reasonable under the circumstances of this case and comports with analogous cases involving loss for the inability to exercise stock options.  (See, e.g., FFD Mem. at 6-7.)  Furthermore, the damages analysis FFD proposes is consistent with the principle that courts award damages to plaintiffs "'for what they lost . . . not . . . for what they might have gained.'"  Wey, 2007 WL 1238596, at *11 (citation omitted). [8]  Here, what Kinsey actually lost was the right to acquire Cendant shares -- a publicly traded security with a readily ascertainable market value -- before April 1, 2002 with a purchase value of $8.85/share.

---

[8]    Kinsey claims that FFD has made an "outrageous" assertion by arguing that Kinsey's damages should be subject to, what he terms, an "artificial ceiling." (Opp. at 14.)  Indeed, this so-called "artificial ceiling" is actually the proper measure of damages -- pursuant to the very cases Kinsey cites.  According to Kinsey's theory, plaintiffs would be able to obtain awards based on their speculative whims, rather than on rational analysis.  This simply is not the law.

## CONCLUSION

For all of the foregoing reasons, and those set forth FFD's opening brief, FFD's

Motion In Limine should be granted in all respects.

Dated: November 10, 2008
        New York, New York

                    Respectfully submitted,

                    SKADDEN, ARPS, SLATE,
                      MEAGHER & FLOM LLP


            By:   /s/ Samuel Kadet
                    Samuel Kadet
                    samuel.kadet@skadden.com
                    Lauren E. Aguiar
                    lauren.aguiar@skadden.com
                    Sarah Heckman Yardeni
                    sarah.yardeni@skadden.com
                    Four Times Square
                    New York, New York 10036-6522
                    (212) 735-3000

                    Attorneys for Defendant, FFD Development
                    Company, L.L.C.

# Tab 1

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 1622261 (S.D.N.Y.)

**H**
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
HALIFAX FUND, L.P. Plaintiff,
v.
MRV COMMUNICATIONS, INC. Defendant.
**No. 00 CIV 4878 HB.**

Dec. 18, 2001.

*OPINION & ORDER*

BAER, J.
*1 Following a three day trial the jury returned a verdict on April 4, 2001 in favor of defendant MRV Communications ("MRV") on the two legal claims presented, breach of contract and negligent misrepresentation. With respect to the two equitable claims, for which the Court requested that the jury provide advisory verdicts, the jury found for MRV on the promissory estoppel claim and for Halifax Fund, L.P. ("Halifax") on the equitable estoppel claim, and awarded $3,625,049 in damages. Both parties submitted post-trial motions requesting that the Court decline to adopt the recommendations of the jury. For the reasons discussed below, I subscribe to the jury's advisory verdicts in regards to liability on equitable claims, and award damages to Halifax of $1,799,417.

BACKGROUND

In 1996, Thomas Lumsden ("Lumsden") of Promethean Investment Group ("Promethean") approached MRV to determine whether MRV would be interested in raising capital through a private financing arranged by Promethean. MRV was interested and Promethean proceeded to line up investors, negotiate the terms of the financing with Edmund Glazer ("Glazer"), MRV's Chief Financial Officer, and perform other services, for which Promethean was compensated by the other investors. The financing consisted of the sale of debentures

and warrants, and occurred in three tranches the last of which closed on August 7, 1996. The warrants issued in connection with the financing granted the warrant holders the right to purchase a predetermined number of common shares at a predetermined price within a given period of time. All of the warrants issued through the financing expired on August 7, 1999.

Halifax, an investment fund managed by The Palladin Group, L.P. ("Palladin"), purchased debentures and warrants from MRV, and later purchased more MRV warrants from two other investors, Samyang Merchant Bank ("Samyang") and CIBC Wood Gundy ("CIBC"). The current litigation concerns only the warrants purchased from Samyang and CIBC; the debentures and warrants that Halifax purchased directly from MRV are not at issue.

In order to their ownership, Promethean forwarded the Samyang and CIBC warrants to MRV in January 1997 and mid-February 1997, respectively, and requested that MRV reissue those warrants in Halifax's name. The Samyang warrants conferred the right to purchase 35,000 shares of MRV common stock at a price of $26.25 per share, and the CIBC warrants conferred the right to purchase 51,000 shares at $26.65 per share. For a number of months MRV sat on the warrants and did nothing despite several requests from Promethean. Although there is some dispute about the implications to the investors of not having physical possession of the warrants, there is no question that the investors were anxious that MRV complete their task and reissue the warrants.

On or about June 15, 1997, MRV issued two warrants to Halifax ("reissued warrants"), one for 35,000 shares and the other for 51,000 shares. Each reissued warrant was dated June 6, 1997, and stated, as had each warrant when originally issued, that it expired on the date "thirty-six (36) months after the date hereof."This language, identical to the expiration clauses of the warrants issued to Samy-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1622261 (S.D.N.Y.)

ang and CIBC on August 7, 1996 and later purchased by Halifax, had on its face the effect of extending the exercise period 10 months until June 6, 2000. At the same time, MRV reissued warrants to other investors from the financing, all with the same expiration clause and all having the effect of extending the original warrant period until June 6, 2000.

**\*2** Jeffrey Devers ("Devers"), Palladin's principal, noticed the extension immediately after receiving the reissued warrants and contacted James O'Brien of Palladin to confirm that the extension had been intentional. As told by Devers, O'Brien reported that Lumsden had negotiated the extension with Glazer as compensation for the delay in MRV's reissuance of the warrants. O'Brien has no recollection of the conversation, and the jury found that Lumsden had not negotiated such an extension and I see no reason to disturb their finding.[FN1] While I find that Devers did have a conversation with O'Brien in which the warrant extension was discussed, I cannot credit Devers' testimony about the contents of that conversation. Devers did not contact MRV directly.

> FN1. Had the jury found otherwise, it would have returned a verdict for plaintiff on the contract claim.

Several years later on March 9, 2000, well before the putative June 6, 2000 expiration of the exercise period, Promethean advised MRV that it wanted to exercise its reissued warrants. At that time, MRV stock, which had long been trading at prices below the \$26.65, the exercise price of the options,[FN2] was enjoying a meteoric rise and was trading at prices nearing \$200 per share. Edmund Glazer of MRV, however, refused to honor the request to exercise the reissued warrants on the ground that the expiration date indicated on the reissued warrants had been a mistake and that the warrants had expired on August 7, 1999. Glazer testified that he had been unaware of the mistake before Promethean's exercise request, and that it occurred to him at that time that others of the warrants might

have the same mistake. That realization, though, apparently did not prompt Glazer to check any of the other warrants, a task amounting to no more than flipping through the binder in which the warrants were kept, or to notify the investors that the warrant period extension was a mistake and that the warrants had in fact expired. Indeed, two weeks later Angelo Gordon, another investor, attempted to exercise its reissued warrants and was refused by MRV. Again, Glazer apparently neither checked other warrants for a mistake nor took steps to notify the investors. Instead, he instructed Lyran Talmor, a MRV employee responsible for the mechanical aspects of exercising warrants, that he should not accept funds from warrant holders or in any way facilitate a warrant exercise until he learned from Glazer that the warrants in question were exercisable. (T.399-403).

> FN2. An option to buy a stock at a price higher than the current market price is often said to be "under water."

In early June 2000, Halifax faxed a notice of the exercise letter to MRV and was told shortly thereafter that MRV would not honor the request. Halifax then sued MRV in this Court, asserting four causes of action: breach of contract, negligent misrepresentation, promissory estoppel and equitable estoppel. Following a three day trial, the jury returned a verdict in favor of MRV on each of the two legal claims. It determined that the reissued warrants were not enforceable contracts, and that MRV had not negligently misrepresented that the warrants would expire 10 months prior to the date indicated on the warrants themselves. Acting in an advisory role, the jury found for defendant on the promissory estoppel claim, but found for plaintiff on the equitable estoppel claim, awarding damages of \$3,625,049.[FN3] Thus, although the jury found that there was not an enforceable agreement to extend the warrant period, and that MRV had not made negligent misrepresentations or promises (promissory estoppel) to Halifax with respect thereto, it did find that MRV had wrongfully con-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1622261 (S.D.N.Y.)

cealed its knowledge that the warrants had expired, and if timely informed Halifax would have spent $3,625,049 less than it ultimately did covering short market positions taken pursuant to a trading strategy that presumed the validity of the warrants as written. In calculating damages as $3,625,049, the jury apparently relied upon Halifax's exhibit number 38.

> FN3. On the equitable estoppel claim, the jury was charged on April 4, 2001 as follows:
>
> "Plaintiff must prove by clear and convincing evidence that:
>
> (1) MRV knew as of March 2000 that the extension of the expiration period on Halifax's reissued warrants was a mistake;
>
> (2) After it learned of the mistake, MRV deliberately concealed that information from Halifax;
>
> (3) Halifax did not know that the reissued warrants contained a mistake and that information was not readily accessible to Halifax;
>
> (4) MRV knew Halifax would rely upon the date indicated on the reissued warrants, and
>
> (5) Halifax relied on the date indicated on the reissued warrants to its detriment."

## DISCUSSION

### Promissory Estoppel

*3 Under New York law, to prevail on a promissory estoppel claim the plaintiff must prove the following three elements by clear and convincing evidence: (1) a clear and unambiguous promise existed between the parties; (2) the party to whom the promise was made forseeably and reasonably relied on the promise; and (3) such party sustained injury as a result of its reliance. *See Cyberchron Corp. v. Calldata Sys. Dev. Inc.,* 47 F.3d 39, 45 (2d Cir.1995) (citation omitted). Here, there was no clear and unambiguous promise. Although the reissued warrants clearly provided for an expiration date of June 6, 2000, the 10 month extension of the warrant period was a mistake and thus did not constitute an enforceable promise. *See Edward Joy Co. v. Noise Control Products. Inc.,* 111 Misc.2d 64, 443 N.Y.S.2d 361, 362 (N.Y.Sup.Ct.1981) ("[n]o authority has been supplied to the court nor could the court find any in which the theory of promissory estoppel was enforced against proof of an honest mistake"). To constitute a promise for purposes of the promissory estoppel doctrine, the representation must be intentional. Since the extension of the warrant period was a mistake, the extension is not a promise and the promissory estoppel claim fails.

### Equitable Estoppel

To establish a claim for equitable estoppel under New York law, Halifax must show by clear and convincing evidence: "(1) An act constituting a concealment of facts or a false misrepresentation; (2) An intention or expectation that such acts will be relied upon; (3) Actual or constructive knowledge of the true facts by the wrongdoers; (4) Reliance upon the misrepresentations which causes the innocent party to change its position to its substantial detriment." *General Electric Capital Corp. v. Armadora,* 37 F.3d 41, 45 (2d Cir.1994); *Farkas v. Farkas.* 168 F.3d 638, 642 (2d Cir.1999) (equitable estoppel analysis focuses upon "intentional concealment"). An act, such as the failure to disclose information, may constitute an act of concealment. *See Decarlo v. Archie Comic Publications. Inc.,* 127 F.Supp.2d 497, 509 (S.D.N.Y.2001); *LaPorto v. Village of Philmont,* 39 N.Y.2d 7, 12, 382 N.Y.S.2d 703, 346 N.E.2d 503 (1976). Such is the case "when one party in a relationship with another has an opportunity to speak in order to avoid harm or injury to the other party and fails to do so to the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1622261 (S.D.N.Y.)

Page 4

ultimate prejudice of the other party." *Columbia Broad Sys. Inc. v. Stockely-Van Camp. Inc.*, 522 F.2d 369, 377 (2d Cir.1975). Equitable estoppel is an equitable remedy, and its application turns upon a close examination of the facts and the equities.

Edmund Glazer knew on March 9, 2000 when Promethean attempted to exercise its reissued warrants that at least some of the warrants reissued on June 15, 1997 mistakenly extended the warrant period, and he knew or should have known that there was a distinct possibility that Halifax mistakenly believed that their warrants could still be exercised. (T. 399-403). He also knew that MRV's stock was trading in the stratosphere and that the warrants were now incredibly valuable. And yet, Glazer took no steps to determine whether Halifax's warrants bore the same mistake as Promethean's or to notify the other investors that there might be a problem. In sum, he chose not to disclose the mistake to Halifax. At trial, Glazer accounted for this striking omission by stating that he presumed Promethean would have notified the other investors, since most of the information during the financing had been run through Promethean with little direct communication between MRV and any of the other investors. Creative but unlikely. The warrants included a provision that required MRV to provide direct notice to the warrant holder in certain circumstances, and the investors never designated Promethean as its conduit for information from MRV. Further, since there was no evidence that Promethean even possessed copies of the other investors' warrants, Promethean would not have known if Halifax's warrants included the same mistake as their own. Perhaps most importantly, Glazer had personally signed each of the reissued warrants and each of the warrants was a misrepresentation, albeit an unintentional one. Thus, Glazer bore a heightened responsibility to find out whether Halifax's warrants included the mistake and if so to notify Halifax.

*4 MRV argues that even if Glazer did conceal the mistake from Halifax while knowing that Halifax would rely on the exercise date provided on the re-issued warrants, Halifax's reliance on the warrants was not reasonable. *SeeBove v. New York City*, 99 civ. 9181, 2000 U.S.App. LEXIS 11895, 6 (2d Cir.2000) ("[t]he ready availability of the allegedly concealed information to the plaintiff fatally undermine his claim of equitable estoppel"). Not the case. Here, Devers, Palladin's principal, noted that the reissued warrants included a 10 month extension, had a conversation with O'Brien about the extension, and acted in accordance with information provided.[FN4]

> FN4. While I do not credit Devers' statement that he was told by O'Brien that the extension had been intentional, I am persuaded that Devers' did discuss the extension with O'Brien.

Equitable Estoppel-Damages

Because it was not told of the mistake on March 9, 2000, Halifax continued to pursue its short selling market strategy, which in vastly oversimplified terms worked as follows. Halifax sold options to buy MRV common stock (that Halifax did not actually own) at a particular price (the "strike price") within a fixed period of time.[FN5] Typically, investors who make these "short sales" are betting that the market price will not exceed the strike price and that the option buyer will have no opportunity to exercise the option. If the short seller guesses incorrectly, and the market price rises above the strike price before the option expires, then he/she must "cover" the short sale by purchasing shares on the common market.

> FN5. The sale of the option nets a small amount which varies according to the likelihood that it will be profitable for the option buyer/holder to buy the common shares at the strike price from the option seller/writer.

Halifax, however, was not like most short-sellers in that it did not execute trades based on assumptions

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1622261 (S.D.N.Y.)

about the future price of MRV stock. Instead, Halifax's trading strategy pursued market neutrality-or, put another way, indifference to the market's movement-which it could do because of MRV warrants. Since the MRV warrants gave Halifax the right to buy 86,000 shares of MRV stock at approximately $26 per share, Halifax could cover any short position of 86,000 shares or fewer at a cost of $26 per share, regardless of MRV's market price. For complicated strategic reasons beyond the scope of this decision, Halifax engaged in a series of transactions-primarily short sales and short covers-to maintain a constant short position of 86,000 MRV shares, but never exercised the MRV warrants.[FN6] Indeed Halifax's strategy was to "lock in" small profits and was bottomed on Halifax holding onto the warrants until the very end of their exercise period when Halifax would exercise and close out its entire MRV short position. Halifax assumed that date would be June 6, 2000.

> FN6. For example, in March 2002, Halifax short sold MRV stock in 18 separate transactions at different strike prices in quantities of 20 and 40 shares, and covered short positions in 10 separate transactions at quantities ranging between 10 and 19,600 shares.

When MRV refused to honor Halifax's request to exercise the warrants on June 5, 2000, Halifax had no choice but to cover the entire 86,000 share short position through market purchases. By the time Halifax completed its cover on June 22, 2000, Halifax had spent $10,399,417.50 (the "June cover").See Def.'s Ex. 8. Thus, for the equitable estoppel claim, the measure of Halifax's damages is the difference between the June cover and what it would have cost Halifax to cover had it been told on March 9, 2000 that the extension of the warrant period had been a mistake and that the warrants had already expired (the "March cover").

**\*5** To this much the parties largely agree. Where they disagree is in the calculation of the March cover.[FN7] In *Schultz v. Commodity Futures Trading Commission,* 716 F.2d 136 (2d. Cir.1983), the Second Circuit stated that:

> FN7. By Halifax's reckoning its damages are at least $3,625,049, the amount awarded by the jury in its advisory verdict, apparently in reliance upon Plaintiff's exhibit 48, at 3 In stark contrast, MRV calculates Halifax's damages as $0.

"[T]he proper rule to be applied in calculating damages when an item of fluctuating value is wrongfully sold, converted or not purchased when it should have been .... is either (1) its value a the time of the [wrong] or (2) its highest intermediate value reached by the stock between notice of the [wrong] and a reasonable time thereafter during which the stock could have been replaced ... whichever of (1) or (2) is [better for the wronged party]."
*Id.* at 139, 141 (hereinafter, *"Shultz* rule"). Subsequent courts have applied this damages rule with respect to warrants for the purchase of common stock and to claims for breach of contract, *see e.g. Commonwealth Assoc. v. Palomar Medical Tech., Inc.* .. 982 F.Supp. 205 (S.D.N.Y.1997); *Flickinger v. Harold C. Brown & Co.,* 789 F.Supp. 616 (W.D.N.Y.1992), and I find that the rule should be applied to the facts presented here, notwithstanding MRV's concern that to determine "a reasonable time" this Court must engage in speculation and guesswork. *See Palomar,* 982 F.Supp. at 208 ("certainty as to the amount of damages is not required, particularly when it is the defendant's breach that has made such imprecision unavoidable").[FN8] Certainly, as MRV argues, it would be little more than a mechanical exercise to calculate damages as of the date Halifax was informed of the mistake in the warrant period, but the purpose of the rule is "to provide a fair valuation of stocks, by allocating the risk of market fluctuation to the breaching party,"*Payne v. Wood,* 1995 U.S.App. LEXIS 22551, 23 (6th Cir.1995), and to redress the unfairness that would result from allowing the party in the wrong to dictate the timing of the inno-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1622261 (S.D.N.Y.)

cent party's trading and thus the recoverable damages. *See id.* ("[t]he risk ... should be assumed by the perpetrator, not by the victim of the wrong); *Lucente v. Int'l Business Machines Corp.*, 117 F.Supp.2d 336, 356 (S.D.N.Y.2000) ("the actual loss to the injured party is the loss associated with being forced to sell at an unfavorable time and being denied the opportunity to sell at a favorable time). These fairness concerns are of particularly salient with respect to equitable claims and in connection with loss mitigation. Where, as here, the innocent party is trading in the market to reduce losses caused in large measure by defendant's mistake, there is no risk of a windfall to the plaintiff. *See Schultz*, 716 F.2d at 141.

> FN8. As MRV points out in its brief, since *Schultz* some courts outside of the Second Circuit, none within, have declined to apply the *Schultz* rule to breach of contract cases. *See Skully v.. U.S. Watts Inc.*, 238 F.3d 497 (3d Cir.2001). However, the damages here do not arise from a breach of contract claim, and like every other court in this Circuit since *Schultz* I do not share the Third Circuit's view that "the speculativeness and hindsight problems attendant to the conversion theory" preclude a court from calculating damages based on stock trades beyond the date of the wrong *Id* at 512-513.

The application of the *Schultz* rule in this case has one unusual permutation. As in *Schultz* and in the cases applying its rule, MRV's commission of a wrong prevented Halifax from trading at favorable prices. In those cases, however, the plaintiff was prevented (either by the nondelivery of stock or for some other reason) from selling stock when market prices were high. *See Palomar*, 982 F.Supp. 205 (defendant refusal to exercise warrants prevented the plaintiff from selling common shares). For that reason, the *Schultz* rule speaks of a plaintiff's right to the *"highest"* intermediate sales price. Here, in contrast, MRV's failure to give timely notice obligated Halifax to make market purchases to cover an open short position. Thus, as applied to these facts, the *Schultz* rule entitles Halifax to the *"lowest"* intermediate purchase price within a "reasonable time."

*6 Because Halifax should have received notice of the mistake from MRV on March 9, 2000 its damages equal the difference between the June cover and the hypothetical March cover, where the March cover is calculated by multiplying 86,000 shares by either (1) MRV's price on March 9, 2000 or (2) the stock's lowest intermediate value between March 9, 2000 and the expiration of a "reasonable time," whichever calculation produces a lower number. [FN9] Since the price of MRV stock was at its zenith on March 9, 2000 ($190.5 per share), the March cover is determined by MRV's lowest intermediate value between then and a "reasonable time" thereafter.

> FN9. Obviously, the lower the price of the March cover, the greater is the difference between the June cover and March cover, and, in turn, the greater is the size of Halifax's damages.

What constitutes a "reasonable time" varies from case to case, *Schultz*, 716 F.2d at 140, but includes at least a "reasonable opportunity to consult counsel ... and to watch the market for the purpose of determining whether it is advisable on a particular day or when the stock reaches a particular quotation, and to raise funds if he decides to repurchase." *Caballero v. Anselmo*, 759 F.Supp. 144, 149 (S.D.N.Y.1991). Here, the time that Halifax actually took to cover its position in June, 2000 provides some guidance as to reasonableness. Although MRV believed that Halifax should have covered earlier than it did, there is no evidence in the record that Halifax's cover period-which began when Halifax received notice from MRV on or about June 5, 2000 [FN10] and concluded 3 weeks later on June 22, 2000-was dilatory. Thus, I find that 3 weeks from March 9, 2000 constitutes a reasonable time. [FN11] Although Halifax might have

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1622261 (S.D.N.Y.)

Page 7

covered in less time, 3 weeks, if not a day or two longer, is a reasonable covered period, especially since MRV's stock was (1) at an all-time high on March 9, 2000 after a meteoric run-up, (2) had a highly volatile trading history of rapid gains and equally rapid retreats, and (3) began falling on March 10, 2000 and continued to drop steeply during the 3 week period.[FN12] A professional investor like Halifax would likely have presumed that the share price would fall from its highs in early March and waited a short time before covering the enormous short position. *See Palomar,* 982 F.Supp. 205 ("[i]n determining damages, we look to what would most probably have occurred"). Between March 9, 2000 and March 30, 2000, the lowest intermediate closing price of MRV stock was $100 per share.[FN13] Thus, the March cover equals $8,600,000 ($100 x 86,000 shares) and Halifax's damages (June cover-March cover) amount to $1,799,417 ($10,399,417.50-$8,600,000).

> FN10. The record is not entirely clear as to when Halifax notified MRV of its intent to exercise, the most likely date is June 2, 2000, and is even less clear as to when MRV declined the exercise request. For the purpose of calculating damages only, I find that Halifax learned of MRV's refusal to exercise on June 5, 2000. Certainly, Halifax received notice no later than June 6, 2000, for on that day Halifax made its first covering transaction.

> FN11. MRV cites to a variety of cases, most of them quite old, in which courts in this district and elsewhere have set the period for measuring damages at less than 3 weeks, but in each case the court set the period based upon the specific facts therein, none of which are present here. For example, in one such case, *Flickinger v. Harold C. Brown & Co.,* 789 F.Supp. 616 (W.D.N.Y.1992), the court observed that a reasonable time "would be a relatively short period, perhaps ten days from

the date of discovery" of the non-delivery of stock," but set the "reasonable time" as 1 month because the court could not determine precisely when the plaintiff discovered that the stock had not been delivered. *Id.* at 620.By the same token, Halifax's argument that a reasonable period is 4 weeks, rather than the 3 it actually used in the June cover, is supported by no specific facts and appears to be no more than an attempt to exploit the $73 price at which the stock was trading on June 6, 2000, the last day of those 4 weeks. While Halifax would likely have waited some time after March 9, 2000 to cover, I do not credit Halifax with market omniscience. For the same reason that I decline to accept Halifax's measure of a "reasonable time" I find that the jury was mistaken in relying, as apparently it did, Halifax's exhibit 48 which stated on page 3 of that exhibit that Halifax's damages were $3,625,049. Although the exhibit did indicate that the $3,625,049 presumed a "First Week Of April" cover date, there was no mention of the "reasonable time" concept or explanation for Halifax's choice of an April cover date.

FN12. The Court also takes note of the high number of covering shares Halifax had to purchase (86,000), the relative difficulty of unwinding such a large short position, and the potentially significant time it would have taken for Halifax to confirm that the extension of the warrants had been a mistake, consult with counsel, determine that further negotiation with MRV would be futile, and devise a cover strategy that took into account the volume of shares available in the market.

FN13. MRV shares closed at $100 per share on March 29, 2000.

## CONCLUSION

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1622261 (S.D.N.Y.)

For the reasons set forth above, I find for MRV on the promissory estoppel claim and for Halifax on the equitable estoppel claim. MRV must pay to Halifax damages in the amount of $1,799,417.

SO ORDERED

S.D.N.Y.,2001.
Halifax Fund, L.P. v. MRV Communications, Inc.
Not Reported in F.Supp.2d, 2001 WL 1622261 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# Tab 2

15 Misc.3d 1127(A)                                                          Page 1
15 Misc.3d 1127(A), 841 N.Y.S.2d 222, 2007 WL 1238596 (N.Y.Sup.), 2007 N.Y. Slip Op. 50880(U)
(Table, Text in WESTLAW), Unreported Disposition

**H**

(The decision of the Court is referenced in a table in the New York Supplement.)

Supreme Court, New York County, New York.

Allison L. WEY, Plaintiff,

v.

The NEW YORK STOCK EXCHANGE, INC. and John Thain, Defendants.

**No. 602510/05.**

April 10, 2007.

CHARLES EDWARD RAMOS, J.

**\*1** In motion 02, defendants, the New York Stock Exchange ("NYSE" or the "Exchange") and John Thain move, pursuant to CPLR 3212, for summary judgment, dismissing the complaint of plaintiff, Allison L. Wey.

In motion 03, defendants move to limit plaintiff's damages evidence at trial.

In motion 05, defendants move for a preliminary injunction restraining plaintiff's counsel Mark Krum from making statements to the press allegedly impugning the character, credibility and reputation of Mr. Thain and sanctioning plaintiff's counsel for making such statements in violation of New York's Code of Professional Responsibility. Defendants also seek relief arising from Mr. Krum's disclosure to the press of a document defendants marked "confidential" allegedly in violation of the parties' confidentiality agreement.

*Background*

Ms. Wey's family owned a seat on the NYSE for many years. Ms. Wey is married to Richard Wey, a floor trader at the NYSE for Bear Wagner Specialists, LLC ("Bear Wagner"). In 2000, plaintiff purchased the seat from her father for $1,100,000. She leased the seat to Bear Wagner and finally sold her seat on March 21, 2005 for $1,540,000.

The NYSE was a not-for-profit organization until March 7, 2006. The owners of the NYSE were 1,366 "seatholders". Mr. Thain has been the NYSE's Chief Executive Officer since January 15, 2004 for the (then non-profit) NYSE, and currently holds the same titles for NYSE Group, Inc., a for-profit, publicly traded entity. On April 20, 2005, approximately one month after Ms. Wey sold her seat, the NYSE announced that it would merge. Immediately thereafter, on April 25, 2005, a seat on the NYSE sold for $2,400,000. Seat prices stayed in that range until July 2005. Sixty seats were sold between April 20, 2005 and December 31, 2005.

*Merger Negotiations*

On January 5, 2005, Archipelago Holdings LLC ("Archipelago"), through the investment bank Goldman Sachs ("Goldman"), approached the NYSE for the first time to inquire whether the NYSE would meet with Archipelago to consider a possible transaction. In January 2005, Mr. Thain and Gerald Putnam, Archipelago's CEO, spoke (at least twice) regarding the general outlines of a possible transaction. Thain 10/26/05 Dep. at 41:19-44:10. A number of meetings followed. David Schwimmer, an investment banker at Goldman who acted as facilitator to the transaction, also attended a number of these meetings with Thain and Putnam. *Id.* at 41:11-18.

On February 3, 2005, NYSE management briefed the NYSE board of directors on the status of its evaluation of possible strategic alternatives, including its preliminary discussions with Archipelago. NYSE Group, Inc., SEC Registration Statement filed 11/3/05 at 59.

On February 10, 2005, NYSE and Archipelago entered into a confidentiality agreement, making it possible for non-public information designated as confidential to be exchanged for the first time. See Confidentiality Agreement dated 2/10/05.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

15 Misc.3d 1127(A)                                                                    Page 2
15 Misc.3d 1127(A), 841 N.Y.S.2d 222, 2007 WL 1238596 (N.Y.Sup.), 2007 N.Y. Slip Op. 50880(U)
**(Table, Text in WESTLAW), Unreported Disposition**

**\*2** On February 14, 2005, preliminary due diligence between the NYSE and Archipelago began. NYSE Group, Inc., SEC Registration Statement filed 11/3/05 at 61, 63. Due Diligence continued for over two months. See Goldman Sachs Proposed Timeline dated March 29, 2005.

### The Meeting

Meanwhile, on February 15, 2005, Mr. Wey attended a closed-door, invitation only breakfast meeting[FN1] where Mr. Thain was to have an open dialogue with "working members"[FN2] of the exchange.[FN3] Daniel Tandy[FN4] 6/13/06 Dep. at 116:15-117:21. Mr. Wey attended the breakfast meeting for the sole purpose of asking Mr. Thain if the NYSE was going public, and based on the answer, would make an informed decision, along with his wife, whether or not to sell her seat. R. Wey 8/8/06 Dep. at 106:5-8; A. Wey 9/12/06 Dep ., 247:10-248:11; 477:20-479:21. Mr. Wey testified that during the breakfast meeting, he asked Mr. Thain "Are we going public?" Mr. Thain responded, "our first priority is hybrid trading."R. Wey 8/8/06 Dep., 223:15-16. Mr. Wey again posed the question "I understand your concerns there, but are we (the NYSE) going public?"*Id.* at 225:18-19.Mr. Thain responded "No, we're not going public. The guys on Wall Street and Broad don't get it. It would take one to two years for us to go public, and there are no plans for that to happen."*Id.* at 226:5-8.Mr. Thain has no specific recollection of Mr. Wey's questions nor of his own responses at the breakfast meeting. Thain 8/9/06 Dep., 18:2-10.

FN1. According to the breakfast meeting memo of February 15, 2005, the invitees and their backgrounds are as follows: Jim McDevitt (specialist), Rick Wey (specialist, owns seat), Glenn Carell (specialist), Rich Como (top floor broker), Frank Cataldo (independent seat owner), Larry Lograno (runs floor for Wachovia), Dan Tandy (runs direct access firm), Randy Beller (broker), Mike O'Conner

(specialist), Steve Steinthal (specialist).

FN2. The memo refers to "floor members" while Mr. Tandy used the term "working members" during his deposition.

FN3. Seatholders on the NYSE were also referred to as "members" of the NYSE. "Working members" hold seats and work on the floor of the exchange.

FN4. Daniel Tandy is a former member of the NYSE's Board of Executives and helped select invitees to the 2/15/05 breakfast meeting.

### The Merger

Under the merger plan with Archipelago, seatholders were entitled to receive $300,000 in cash and 80,177 shares of NYSE Group, subject to a variety of lock-up restrictions.[FN5] Seatholders could also make a cash election or a stock election. On March 10, 2006, each seatholder as of March 6, 2006 was paid $70,570.78 in dividends per seat owned.

FN5. Trading opened at $67 per share and increased to approximately $100 where it remains today.

On July 13, 2005, the day after the complaint was filed, a seat was sold for $2,410,000. However, plaintiff's expert, Mr. Pomerantz, seeks to measure damages by the difference between the price of plaintiff's seat in March 2005 (when she sold it) and the price of NYSE Group shares in May 2006, November 2006, March 2008 and March 2009. Among other things, Mr. Pomerantz assumes that Ms. Wey would not have sold her seat before December 31, 2005 because only 60 seatholders, or less than 5%, sold their seats during that period after the merger announcement up to December 31, 2005.

Plaintiff alleges claims for fraudulent misrepresentation, negligent misrepresentation and breach of fiduciary duty.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

15 Misc.3d 1127(A)                                                                                    Page 3
15 Misc.3d 1127(A), 841 N.Y.S.2d 222, 2007 WL 1238596 (N.Y.Sup.), 2007 N.Y. Slip Op. 50880(U)
**(Table, Text in WESTLAW), Unreported Disposition**

### Summary Judgment Standard

In order to grant summary judgment, the court must determine whether a material and triable issue of fact exists. *See Sillman v. Twentieth Century-Fox Film Corp.,* 3 N.Y.2d 395, 165 N.Y.S.2d 498, 144 N.E.2d 387, Rehearing denied, 3 N.Y.2d 941 (1957). After the movant makes a prima facie case, the burden shifts to the opposing party to produce evidentiary proof sufficient to establish the existence of a material issue of fact that requires a trial. *Winegrad v. New York Medical Univ. Med. Cen.,* 64 N.Y.2d 851, 487 N.Y.S.2d 316, 476 N.E.2d 642 (1985). When deciding a motion for summary judgment, the court must view the evidence in a light most favorable to the party opposing the motion and must give that party the benefit of every inference which can be drawn from the evidence. *See Assaf v. Topog. Cab Corp.,* 153 A.D.2d 520, 544 N.Y.S.2d 834 (1st Dept 1989).

**\*3** However, on a motion for summary judgment to dismiss the complaint, if it is determined that due to a lack of competent evidence, no reasonable jury could conclude the allegations, dismissal may be appropriate for lacking a material issue in dispute. See *Speller v. Sears, Roebuck & Co.,* 100 N.Y.2d 38, 760 N.Y.S.2d 79, 790 N.E.2d 252 (2003).

### Fraudulent Misrepresentation

In order to prove fraudulent misrepresentation, plaintiff must be able to show that the (1) defendants made a material false representation; (2) defendants intended to defraud the plaintiff thereby; (3) plaintiff reasonably relied upon the representation; and (4) plaintiff suffered damage as a result of the reliance. *J.A.O. Acquisition Corp. v. Stavitsky,* 18 A.D.3d 389, 795 N.Y.S.2d 569 (1st Dept 2005).

Plaintiff asserts that as to the second and third elements (intent to defraud and reasonable reliance) she will prove at trial that Mr. Thain had reason to expect Ms. Wey, who was not at the February meeting, to rely on Mr. Thain's statement to Mr.

Wey and the others attending the meeting. Plaintiff, without citing one case, urges this Court to rely on the "reason to expect" theory of fraud under Restatement (Second) of Torts § 533 which provides:

> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has *reason to expect* that its terms will be repeated or its substance communicated to the other, and that it will *influence his conduct* in the transaction or type of transaction involved. *Emphasis supplied.*

As defendants correctly point out, under this theory, plaintiff fails to demonstrate competent evidence that Mr. Thain had a reason to expect that Mr. Wey would communicate the statement to *this* particular plaintiff, his wife.

Mr. Wey, who attended the breakfast meeting, is not the owner of the seat, but was listed as "owns seat" on a memo given to Mr. Thain prior to the meeting. The breakfast memo listed the names and describing backgrounds of the invitees at the closed-door meeting. Such a memo was typically made available to Mr. Thain prior to the breakfast meeting. Thain 8/9/05 Dep., 43:24-45:8. It is an issue of fact whether the memo was reviewed by Mr. Thain before his statement to Mr. Wey. Thain Dep 8/9/05, 51:7-52:13. Although the memo listed Mr. Wey as owning a seat, the memo *made no reference to Ms. Wey.* Mr. Wey even admits that Mr. Thain had no knowledge of plaintiff's ownership of the seat or that she was thinking about selling it. R. Wey Dep., 222:13-223:3.

Furthermore, § 533 would require Mr. Thain's statement to "influence (plaintiff's) conduct" to sell her seat. Ms. Wey admits in her deposition that she had no reason to believe that Mr. Thain (through his statement) was trying to get her to sell her seat. A. Wey 9/12/06 Dep., 285:12-17.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

15 Misc.3d 1127(A)                                                                                                      Page 4
15 Misc.3d 1127(A), 841 N.Y.S.2d 222, 2007 WL 1238596 (N.Y.Sup.), 2007 N.Y. Slip Op. 50880(U)
**(Table, Text in WESTLAW), Unreported Disposition**

The same outcome bars plaintiff's proposed application of Comment c. to § 533 which provides:

> *4 The rule stated in this Section is applicable not only when the effect of the misrepresentation is to induce the other to enter into a transaction with the maker, but also when he is induced to enter into a transaction with a third person.

No evidence supplied by plaintiff suggests that Mr. Thain had a reason to expect that Ms. Wey would be induced to enter a transaction with a third person.

However, Restatement (Second) of Torts § 531, broadens the scope of § 533 to "class of persons" intended or reasonably expected to act in justifiable reliance on the statement. Defendants fail to address § 531. The Court agrees with plaintiff's proposed application of this provision of the Restatement. Restatement (Second) of Torts § 531 provides:

> One who makes a fraudulent misrepresentation is subject to liability to the persons or *class of persons whom he intends or has reason to expect to act...in reliance* upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced. *Emphasis supplied.*

The Court finds that a reasonable jury could conclude that Mr. Thain had reason to expect that his statement about the future of the NYSE to a group of "floor traders," some of which Mr. Thain knew currently owned seats on the exchange, would be justifiably influenced to act (i.e.trade, etc) in reliance on the statement. Therefore, triable issues of material fact exist and the claim must be determined by a fact finder.

This Court is not alone in relying on § 531 under similar circumstances. Indeed, its application in New York has a long history. Federal courts applying New York law, as well as New York courts

have applied the "class of persons" expansion to fraudulent misrepresentation claims.

In *Greene v. Mercantile Trust Co.,* 60 Misc. 189, 111 N.Y.S. 802 (Sup. Ct, Erie County, affirmed, 128 A.D. 914, 112 N.Y.S. 1131 (4th Dept 1908), plaintiff's action for fraud and deceit was upheld against defendant corporation for inducing him to purchase shares of the corporation by means of false and fraudulent misrepresentations in a prospectus. The court opined:

> "where one makes false representations, known to be such and intended to influence another, and which come to the latter's knowledge, and in reliance on which he in good faith parts with property or incurs an obligation, the one making the representations renders himself liable for the damages sustained, and it is not necessary that the representations be made to plaintiff personally; it being sufficient that they are made to the public at large for the purpose of influencing any one who may act on them."

*Id.* See also, *Brackett v. Griswold,* 112 N.Y. 454, 20 N.E. 376 (1889)(Court of Appeals applied a similar standard on a fraudulent misrepresentation claim regarding a false corporate prospectus).

In *Wechsler v. Hoffman-LaRoche, Inc.,* 198 Misc. 540, 99 N.Y.S.2d 588, (Sup. Ct, Bronx County 1950), a fraud claim was upheld by a third-party against a drug manufacturer that misrepresented the drug's fatal propensities to the prescribing doctor. The court opined:

> *5 "Reliance upon fraudulent representations by persons who are not the direct addressees thereof but who may be intended or expected to learn of and act upon such representations will found an action in fraud and deceit."

*Id.* at 590,*aff'd as modified,* 279 AD 654 (1951).

In *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931), Justice Cardozo explained that "[accountants] owed to their employer a duty im-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

15 Misc.3d 1127(A)
15 Misc.3d 1127(A), 841 N.Y.S.2d 222, 2007 WL 1238596 (N.Y.Sup.), 2007 N.Y. Slip Op. 50880(U)
**(Table, Text in WESTLAW), Unreported Disposition**

posed by law to make their certificate without fraud ... to creditors and investors to whom the employer exhibited the certificate, since there was notice in the circumstances of its making that the employer did not intend to keep it to himself." *Id.* at 179, 174 N.E. 441.See also, *Berkowitz v. Baron,* 428 F.Supp. 1190 (S.D.N.Y.1977), (defendant knowingly participated in the issuance of a false and materially misleading accounting report of company upon which plaintiffs relied and bought stock; the court held "in order for [defendant] to be liable to these plaintiffs, they must be within the class of persons that [defendant] should reasonably have expected to rely on them"). *Id.* at 1196.

Applying the threshold requirement of *Ultramares,* in order for Mr. Thain to be liable to this plaintiff, Ms. Wey must be within the class of persons (seatholders on the exchange) that Mr. Thain should reasonably have expected to rely on his statements. See *American Elec. Power Co. v. Westinghouse Elec. Corp.,* 418 F.Supp. 435, 450 (S.D.N.Y.1976). Here, it is undisputed that Ms. Wey was in fact a seatholder at the time of Mr. Thain's statement. Therefore, a reasonable jury could conclude that Mr. Thain intended that seatholders, as a class, would reasonably rely on his statement.

As to the element of falsity, which includes not only that the statement was in fact false, but also that defendant had knowledge that the statement was false [*Gerald Modell, Inc. v. Schraeder,* 6 Misc.3d 1013A (Sup.Ct. N.Y. County 2004) ], defendants argue that there is no evidence that Thain intended to make a misrepresentation because he testified during his deposition that he thought his statement was true. Even though Mr. Thain claims to have no specific knowledge of Mr. Wey's question or his own response at the breakfast meeting, Mr. Thain testified that he would have understood Mr. Wey's question, "are we going public" to be asking whether the NYSE was planning to undertake an initial public offering ("IPO"). Thain 8/9/06 Dep., 22:14-23:7.In David Schwimmer's prior testi-

mony in a related case [FN6] and his deposition in this case Mr. Schwimmer testified that at a meeting with Mr. Thain on January 24, 2005, he presented him with two "possible transaction structures that might work" between the NYSE and Archipelago. Schwimmer 12/8/06 Dep., 67:7-16; 68:3-7; Schwimmer Trial Testimony, November 14, 2005, *Higgins v. The New York Stock Exchange,* 10 Misc.3d 257, 806 N.Y.S.2d 339, (Sup Ct. N.Y. County, 2005, J. Ramos), 68:10-18. The first was an "outright acquisition" which would involve a "cash acquisition of Archipelago at a market cap plus a premium."Schwimmer Trial Testimony, 68:19-20; Schwimmer 12/8/06 Dep., 68:19-69:8. This structure would involve an initial public offering ("IPO") process, that would take unusually two to four years to complete. Schwimmer Trial Testimony, 169:24-171:14. The second was a "merger" between the two entities, the result of which would create a new public corporation without the need for an IPO. Schwimmer 12/8/06 Dep., 72:9-17. After discussing the advantages and disadvantages of each structure, Mr. Thain agreed to pursue structure two, the merger structure. Schwimmer Trial Testimony, 70:2-71:6.

> FN6. November 14, 2005, *Higgins v. The New York Stock Exchange,* 10 Misc.3d 257, 806 N.Y.S.2d 339, (Sup Ct. N.Y. County, 2005, J. Ramos).

**\*6** Therefore, Mr. Thain was aware and was considering (as of January 24, 2005) an alternative transaction structure that could facilitate the NYSE to become a public entity without an initial public offering. This second (merger) structure was the same or similar structure that was subsequently executed between the two entities. Schwimmer Trial Testimony, 167:22-168:5. This discrepancy raises the issue of Mr. Thain's credibility, an issue best left to a trier of fact. See e.g. *Lapidus v. New York City Chapter of New York State Asso. for Retarded Children, Inc.,* 118 A.D.2d 122, 129, 504 N.Y.S.2d 629 (1st Dept 1986).

Furthermore, the facts alleged relative to actual

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

15 Misc.3d 1127(A)                                                                           Page 6
15 Misc.3d 1127(A), 841 N.Y.S.2d 222, 2007 WL 1238596 (N.Y.Sup.), 2007 N.Y. Slip Op. 50880(U)
**(Table, Text in WESTLAW), Unreported Disposition**

falsity of Mr. Thain's statement are disputed. Defendants list a time-line of events contending that no reasonable jury could conclude that the NYSE had plans to go public as of February 15, 2005.

Plaintiff, however, alleges that even though the merger agreement was not yet signed between the NYSE and Archipelago at the time of Mr. Thain's statement, negotiations were well underway. For example, a framework for negotiation was accepted by the CEOs of both parties. Richard M. Phillips 11/17/2006 Dep. 169:1-13. The parties intended to move rapidly (one of the goals was to achieve a structure allowing the NYSE become a public entity as soon as possible. Schwimmer Trial Testimony, 170:3-7. The negotiations could lead to the NYSE becoming a public entity (after all appropriate approvals) "immediately." Schwimmer Trial Testimony, 171:18-172:8.

Therefore, defendants' contention that no reasonable jury could conclude that the NYSE had plans to go public as of the date of Mr. Thain's statement is rejected.

Finally, there is no dispute as to whether plaintiff has been damaged. Rather, if successful in proving the liability of defendants, the measure of damages is disputed.[FN7]

> FN7. A detailed analysis of the measure of damages is discussed below with regard to defendants' motion in limine to preclude plaintiff's damages calculation.

*Negligent Misrepresentation*

Count two must be dismissed as a matter of law because Mr. Thain did not make the statement to plaintiff and he had no notice that Mr. Wey was acting on plaintiff's behalf.

The Court of Appeals has held that before a party may recover in tort for pecuniary loss sustained as a result of another's negligent misrepresentations there must be a showing of a special relationship, that being, actual privity of contract between the

parties or a relationship so close as to approach that of privity. *Prudential Ins. Co. v. Dewey Ballantine, Bushby, Palmer & Wood,* 80 N.Y.2d 377, 590 N.Y.S.2d 831, 605 N.E.2d 318 (1992), Reconsideration denied, 81 N.Y.2d 955, 597 N.Y.S.2d 940, 613 N.E.2d 972 (1993). The special relationship must be one of "trust or confidence, which creates a duty for one party to impart correct information to another." *Hudson River Club v. Consolidated Edison Co. of New York, Inc.* 275 A.D.2d 218, 220, 712 N.Y.S.2d 104 (1st Dept 2000). The special relationship requires a closer degree of trust than that in an ordinary business relationship. See *Dorsey Products Corp. v. United States Rubber Co.,* 21 A.D.2d 866, 251 N.Y.S.2d 311 (1st Dept 1964), affirmed 16 N.Y.2d 925, 264 N.Y.S.2d 917, 212 N.E.2d 435 (1965).

**\*7** Further, if no actual privity exists (as neither party here contends), plaintiff must prove "(1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance." *Parrott v. Coopers & Lybrand, LLP,* 95 N.Y.2d 479, 718 N.Y.S.2d 709, 741 N.E.2d 506 (2000) [citing *Prudential Ins. Co. Of America v. Dewey, Ballantine, Bushby, Plamer & Wood,* 80 N.Y.2d 377, 384, 590 N.Y.S.2d 831, 605 N.E.2d 318 (1992) ].

Ms. Wey was not a "known party" to Mr. Thain at the time of the speaking."[G]enerally, a negligent statement may be the basis for recovery of damages where there is carelessness in imparting words upon which others were expected to rely and upon which they did act or failed to act to their damage, but such information is not actionable unless *expressed directly,* with knowledge or notice that it will be acted upon, to one to whom the author is bound by some relation of duty, arising out of contract or otherwise, to act with care if he acts at all." *White v. Guarente,* 43 N.Y.2d 356, 363, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977).*Emphasis supplied.*(Internal

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

15 Misc.3d 1127(A)                                                                                      Page 7
15 Misc.3d 1127(A), 841 N.Y.S.2d 222, 2007 WL 1238596 (N.Y.Sup.), 2007 N.Y. Slip Op. 50880(U)
**(Table, Text in WESTLAW), Unreported Disposition**

citations omitted).

Here, it is of no consequence if Mr. Thain "knew" that Mr. Wey was an owner of a seat because Mr. Wey is not the plaintiff. It is undisputed that Mr. Thain's statement was not "expressed directly" to plaintiff Ms. Wey and no evidence is provided that could impute knowledge to Mr. Thain that Mr. Wey was acting in an agency capacity for his wife. See e.g. *De Atucha v. Mfg. Trust Co.*, 155 N.Y.S.2d 537 (*no official citation* )(Sup Ct, N.Y. County, 1956), *aff'd*, 3 A.D.2d 902, 163 N.Y.S.2d 402 (1st Dept)(a negligent misrepresentation claim by a third-party may proceed if an agency or representative relationship existed and the defendant had actual knowledge of it), appeal denied, 3 A.D.2d 1004, 165 N.Y.S.2d 434,appeal denied, 3 N.Y.2d 706 (1957). Plaintiff has failed to set forth any evidence to support such a jury determination, thus the second cause of action must be dismissed as a matter of law.

*Breach of Fiduciary Duty*

Defendants' motion for summary judgment dismissing the third cause of action for breach of fiduciary duty is denied because triable issues of material fact exist.

In the complaint, plaintiff alleges that Mr. Thain breached his fiduciary duty in making a false and/or materially misleading statement at the breakfast meeting on February 15, 2005.

A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the *scope of the relation*. *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 799 N.Y.S.2d 170, 832 N.E.2d 26 (2005)(Emphasis supplied).

Defendants argue that Mr. Thain was not acting in the scope of the relationship with plaintiff as a seatholder because the breakfast meeting was a "private meeting with floor traders." However, the memo identified Mr. Wey as a "specialist and own-

er" and others as "floor members" or seatholders. Plaintiff asserts that Mr. Thain's alleged false statement was a breach of fiduciary duty to the "class of seatholders," giving rise to plaintiff's individual cause of action (whether Mr. Wey had asked the question or not). This raises a disputed issue. That is, the purpose of the breakfast meetings. According to Mr. Thain and Mr. Tandy, the purpose of all the breakfast meetings was to:

**\*8** "have a dialogue with the people on the exchange who don't have an opportunity ... to talk to me very often, to have them ask questions, express concerns etcetera."Thain 8/9/05 Dep., 12:7-12.

"provide access from the various people on the floor who otherwise didn't typically have access to me, to ask questions to me, to make comments, the types of questions ... ranged from the market structure to business strategy to ownership structure to seat values and lease rates ..." Mr. Thain 8/9/05 Dep., 79:10-20.

"update members in smaller groups ... [because] the town hall meetings became very dominated by lessors, and it became very difficult for working members to get their questions answered ..." Tandy 6/13/06 Dep. 116:23-117:4.

"we were more focused on day-to-day, you know, what's it going to mean to me. So, John [Mr. Thain] agreed to do smaller group meetings to inform us better in terms of what his views were and what he thought ... the future was going to look like."Tandy 6/13/06 Dep. 117:9-15.

"anything was on the table ... he was very good about allowing questions on any topic."Tandy Dep. 117:19-21.

Given these somewhat inconsistent viewpoints, the Court is unable to rule as a matter of law, whether Mr. Thain was acting in the scope of his relationship with seatholders while conducting these meetings. Thus, the claim stands and must be presented

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

15 Misc.3d 1127(A)                                                      Page 8
15 Misc.3d 1127(A), 841 N.Y.S.2d 222, 2007 WL 1238596 (N.Y.Sup.), 2007 N.Y. Slip Op. 50880(U)
**(Table, Text in WESTLAW), Unreported Disposition**

to a trier of fact.

If a jury determines that Mr. Thain was not acting in the scope of his relationship with seatholders, no fiduciary duty can be breached. However, if answered in the affirmative, the issue of "inaccurate, incomplete, or misleading prior disclosures" becomes a central issue. See *Hyman v. The New York Stock Exchange, et al.,* 2007 N.Y. Misc. LEXIS 143 (Sup Ct, N.Y. County 2007, J. Ramos).

Generally, there is no duty to disclose confidential business negotiations. However, in *Lindner Fund, Inc. v. Waldbaum, Inc.* 82 N.Y.2d 219, 223, 604 N.Y.S.2d 32, 624 N.E.2d 160 (1993), the Court of Appeals noted that a special duty to disclose may arise in the case of insider trading, a statute or regulation requiring disclosure, or inaccurate, incomplete, or misleading prior disclosures. If a jury should determine that Mr. Thain's statement was incomplete or otherwise misleading, in accord with *Lindner,* a duty to immediately rectify the disclosure "springs into being." *Lindner,* 82 N.Y.2d at 223, 604 N.Y.S.2d 32, 624 N.E.2d 160.

Defendants contend that Mr. Thain's statement at the breakfast meeting was warranted because he was operating under a February 10, 2005 confidentiality agreement obligating him not to disclose the status of discussions concerning a potential transaction between the parties.

This Court does not agree. New York courts have recognized the need for confidentiality in merger negotiations to avoid speculative or premature market fluctuations. *Lindner,* 82 N.Y.2d at 223, 604 N.Y.S.2d 32, 624 N.E.2d 160.However, Mr. Thain's actions were arguably in contravention of the confidentiality agreement and *Lindner.*Confidentiality is the state of having the dissemination of certain information restricted. Blacks Law Dictionary, Seventh Edition, Page 294. This is achieved by *refusing to speak* on the issue. Fact or fiction, Mr. Thain chose to speak at the breakfast meeting with regard to the future of the NYSE. As *Lindner* instructs, if a

fiduciary chooses to disclose information to shareholders, it must be accurate, complete, and not misleading. *Lindner,* 82 N.Y.2d at 223, 604 N.Y.S.2d 32, 624 N.E.2d 160.This determination is a question for a jury. See e.g. *Curanovic v. N.Y. Cent. Mut. Fire Ins. Co.,* 307 A.D.2d 435, 762 N.Y.S.2d 148 (3rd Dept 2003) (whether a statement is materially misleading is a question of fact that requires denial of ... [a] motion for summary judgment). Thus, the motion is denied as to count three.

*In Pari Delicto and Unclean Hands*

**\*9** Defendants contend the Weys' concerted effort to have Mr. Wey attend the breakfast meeting to solicit inside information from Mr. Thain and make a trade based on that disclosure, bars plaintiff from relief under principles of equity. See R. Wey 8/8/06 Dep. 106:5-8; 195:9-25; 105:22-106:8; A. Wey 9/12/06 Dep. 244:18-245:3; 247:10-248:11; 477:20-479:21.

To this end, defendants raise two related equitable defenses. *In pari delicto* which literally means "in equal fault," and *unclean hands,* which stands for the proposition that a plaintiff may not profit from her own wrongdoing. *Riggs v. Palmer,* 115 N.Y. 506, 22 N.E. 188 (1889); *Reno v. D'Javid,* 55 A.D.2d 876, 390 N.Y.S.2d 421 (1st Dept, affirmed, 42 N.Y.2d 1040, 399 N.Y.S.2d 210, 369 N.E.2d 766 (1977). First, unclean hands is an equitable defense that is unavailable in an action exclusively for damages. *Manshion Joho Ctr. Co., Ltd. v. Manshion Joho Ctr., Inc.,* 24 A.D.3d 189, 806 N.Y.S.2d 480 (1st Dept 2005)[citing *Hasbro Bradley, Inc. v. Coopers & Lybrand,* 128 A.D.2d 218, 515 N.Y.S.2d 461 (1st Dept 1987) ]. This is an action at law; thus, unclean hands is inapplicable to this case.

The defense of *in pari delicto* is grounded on two premises: (1) courts should not lend their good offices to mediating disputes among wrongdoers; and (2) denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality. *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

15 Misc.3d 1127(A)                                                                                     Page 9
15 Misc.3d 1127(A), 841 N.Y.S.2d 222, 2007 WL 1238596 (N.Y.Sup.), 2007 N.Y. Slip Op. 50880(U)
**(Table, Text in WESTLAW), Unreported Disposition**

299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985).*In pari delicto* requires immoral or unconscionable conduct that makes the wrongdoing of the party against which it is asserted at least equal to that of the party asserting it. *Chemical Bank v. Stahl,* 237 A.D.2d 231, 655 N.Y.S.2d 24 (1st Dept 1997).

The *in pari delicto* defense is used sparingly. *Alami v. Volkswagen of America, Inc.,* 97 N.Y.2d 281, 287-8, 739 N.Y.S.2d 867, 766 N.E.2d 574 (2002). See *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968)(not recognizing *in pari delicto* defense in Clayton Antitrust action). The Weys' alleged wrongdoing was an attempt to trade using insider information, possibly a criminal violation of federal and state securities laws. *Dirks v. SEC,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983); *People v. Napolitano,* 282 A.D.2d 49, 724 N.Y.S.2d 702 (1st Dept 2001), appeal denied, 96 N.Y.2d 866, 730 N.Y.S.2d 40, 754 N.E.2d 1123 (2001). Accordingly, we can look to federal securities litigation for guidance. See *Ross v. Bolton,* 904 F.2d 819 (2d Cir.1990)(recognizing defense in securities cases). To ensure that the defense is narrowly applied in such cases, the Supreme Court in *Bateman Eichler, Hill Richards, Inc. v. Berner, supra,* set forth a two-part test for the application of the defense in private causes of action under securities laws. *Bateman Eichler,* 472 U.S. at 310-11.The Court noted that the doctrine may bar an action "where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public."*Id.*

**\*10** The first prong of the test sets forth the essential elements of the doctrine. See *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). Courts apply the defense where the plaintiff has participated in some of "the same sort of wrongdoing" as the defendant. *Bateman Eichler,*

472 U.S. at 307.

"A defendant cannot escape liability unless, as a direct result of the plaintiff's own actions, the plaintiff bears at least substantially equal responsibility for the underlying illegality. The plaintiff must be an active, voluntary participant in the unlawful activity that is the subject of the suit ..." *Pinter,* 486 U.S. at 636.

The process of weighing these faults is the function of the jury. See *Banks v. Central Hudson Gas & Electric Corp.,* 224 F.2d 631 (2d Cir, cert. denied, 350 U.S. 904, 76 S.Ct. 182, 100 L.Ed. 793 (1955).

The second prong, which considers public policy implications of applying the defense, is consequential of the first. As the Supreme Court noted in *Pinter,* refusal of relief to those less blameworthy would frustrate the purpose of the securities laws; it would not serve to discourage the actions of those most responsible for organizing forbidden schemes; and it would sacrifice protection of the general investing public in pursuit of individual punishment. *Pinter,* 486 U.S. at 636.

The Court queries whether this defense, as applied to the facts here, is dispositive of the action. Assuming for the purpose of this motion only Mr. Thain's alleged wrongful conduct, if no reasonable jury could conclude that Mr. Thain's alleged misrepresentation and breach of fiduciary duty is substantially equal to or outweighs plaintiff's wrongful conduct of seeking insider information from Mr. Thain, a possible violation of criminal law, then the action must be dismissed. The question is whether plaintiff actually attempted to violate the federal insider trading law or any other law and if so whether, as a matter of law, that would overwhelm any bad act by Mr. Thain. *People v. Napolitano, supra; Country-Wide Home Loans, Inc. v. LaFonte,* No. 14265/01, 2003 WL 1389089, at *3 (Sup Ct, Nassau County 2003); *Drexel Burnham Lambert Group, Inc. v. Vigilant Ins. Co.,* 157 Misc.2d 198, 212-214, 595 N.Y.S.2d 999 (Sup Ct, N.Y. County 1993). For example, was Mr. Thain or Mr. Wey a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

15 Misc.3d 1127(A)                                                                                                      Page 10
15 Misc.3d 1127(A), 841 N.Y.S.2d 222, 2007 WL 1238596 (N.Y.Sup.), 2007 N.Y. Slip Op. 50880(U)
**(Table, Text in WESTLAW), Unreported Disposition**

tipper, and if so, what are the consequences? *Dirks v. SEC,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983); *People v. Napolitano, supra.*Even, if Wey's act was not criminal, *in pari delicto* could still apply. *See also, Smith v. Jay Apartments, Inc.,* 33 A.D.2d 624, 304 N.Y.S.2d 737 (3d Dept 1969)(negligent landlord's complaint against elevator company dismissed because landlord was *in pari delicto* for knowing about condition of elevator but failing to warn tenants), appeal denied, 26 N.Y.2d 609, 307 N.Y.S.2d 1027, 255 N.E.2d 785 (1970). Therefore, the parties are instructed to brief the issue within thirty days after service of this order with notice of entry. The parties are to simultaneously exchange briefs solely addressing the *in pari delicto* defense. Replies shall be exchanged thirty days thereafter. The parties shall deliver copies of their briefs to the Court's part clerk, Room 238 and call the part clerk to schedule a mutually agreeable date and time for argument.

### Claims Against the NYSE

**\*11** Plaintiff alleges that the NYSE is vicariously liable for Mr. Thain's alleged wrongful acts. The NYSE motion to dismiss the breach of fiduciary duty claim is granted as a corporation, even a non-profit organization, has no fiduciary duty to its shareholders, or seatholders in this case. See *Gates v. BEA Assoc., Inc.,* NO. 88 Civ. 6522, 1990 WL 180137, at \*6 1990 U.S. Dist Lexis 15299 (S.D.N.Y.1990). Having dismissed the negligent misrepresentation claim, the only remaining claim against the NYSE is vicarious liability for Thain's alleged misrepresentation.

### Damages

In the complaint, plaintiff seeks unspecified damages. In a New York Post article, Mr. Krum was quoted as saying that Ms. Wey would be seeking damages of "at least $1 million," plus other, unspecified damages." In the note of issue, dated December 13, 2006, plaintiff demands $4,384,561.

There is no dispute that if plaintiff establishes liability, she is entitled to damages. The issue is what constitutes the proper measurement of damages?

> The true measure of damage is indemnity for the actual pecuniary loss sustained as the direct result of the wrong" or what is known as the "out-of-pocket" rule [citation omitted]. Under this rule, the loss is computed by ascertaining the "difference between the value of the bargain which a plaintiff was induced by fraud to make and the amount or value of the consideration exacted as the price of the bargain" [citation omitted]. Damages are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained. [citation omitted]. Under the out-of-pocket rule, there can be no recovery of profits which would have been realized in the absence of fraud [citations omitted].

*Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996). Plaintiff challenges the applicability of Lama Holdings to this case. Lama Holding Co. owned 24% of the shares of Smith Barney and had a right of first refusal on any merger with Smith Barney, pursuant to a complex tax structure in the United States Tax Code, known as the General Utilities Doctrine, which allowed a domestic company to sell its assets without incurring tax liability. *Id.* at 419-420, 646 N.Y.S.2d 76, 668 N.E.2d 1370.When Smith Barney agreed to sell all of its stock to Primerica, Smith Barney met with Lama to induce it to agree to the merger immediately without the advice of legal or financial counsel. *Id.* at 419, 646 N.Y.S.2d 76, 668 N.E.2d 1370.Unbeknownst to Lama, months earlier, Congress had changed the Tax Code repealing the General Utilities Doctrine. Lama contended it was fraudulently induced to agree to the merger which resulted in a tax liability to Lama of $33 million. *Id.* at 420, 646 N.Y.S.2d 76, 668 N.E.2d 1370.Lama alleged fraud based on Smith Barney's failure to disclose that Primerica could withdraw from the merger if 5% of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

15 Misc.3d 1127(A)    Page 11
15 Misc.3d 1127(A), 841 N.Y.S.2d 222, 2007 WL 1238596 (N.Y.Sup.), 2007 N.Y. Slip Op. 50880(U)
**(Table, Text in WESTLAW), Unreported Disposition**

common stockholders did not approve the transaction nor the tax consequences of the sale. *Id.* In other words, with 24% of the shares, and had it known, Lama could have stopped the merger. Lama attempted to negotiate a separate purchase transaction with Primerica, but it refused. *Id.* The court held that Lama could not measure its damages based on Lama's proposed deal with Primerica as it was speculative. *Id.* at 422, 646 N.Y.S.2d 76, 668 N.E.2d 1370.

**\*12** Plaintiff argues that the *Lama* case is inapplicable here as Ms. Wey's alternative contractual bargain was concrete and embodied in the merger terms offered to the seatholders. However, this is not a breach of contract action, but a fraud case and thus *Lama* clearly applies. Here, the undisclosed deal, to merge with Archipelago, closed, just as the undisclosed deal in Lama, Smith Barney with Primerica, closed. Plaintiff cannot in hindsight compare the certainty of the merger here with the uncertainty of the deal Lama proposed to Primerica. Likewise, in hindsight, plaintiff proposes that the merger terms are concrete. But until the deal closed on March 7, 2006, there was always a risk that the merger would not occur and the market price of seats would reflect that risk.

Defendants' motion is granted as plaintiff's proposed measure of damages is too speculative. While lost profits are recoverable in both fraud and contract actions, in either case they "may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes." *Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986). Where contract damages are limited to those reasonably contemplated by the parties, for fraud, the loss must naturally follow the wrongful act. *Schile v. Brokhahus,* 80 N.Y. 614, 620 (1880). Reasonable certainty is always required. *Delehanty v. Walzer,* 59 N.Y.S.2d 777 (Sup Ct, Kings County 1945)(no official citation), *judgment rev'd on other grounds,* 271 A.D. 886, 67 N.Y.S.2d 25, (2d Dept

1946), *judgment aff'd,* 298 N.Y. 820, 83 N.E.2d 863 (1949). Multiple assumptions will doom a projection. *Kenford* at 262, 502 N.Y.S.2d 131, 493 N.E.2d 234.Here, plaintiff assumes the following: (1) she would not have sold after the merger announcement; (2) she would have received annual lease income of $200,000 even though her actual lease income was $83,000 in 2005; (3) she would have elected the maximum cash payments between 2006 and 2009; (4) the NYSE stock price can be projected for March 2008 and March 2009. Depending on plaintiff's expert's underlying assumptions, plaintiff's estimated damages vary by as much as $3 million. These multiple assumptions doom reasonable certainty.

The measure of damages for items of fluctuating value such as marketable securities will be the difference between the proceeds received and the highest market value within a reasonable time after notice of the fraud. *Gelb v. Zimet Brothers, Inc.,* 34 Misc.2d 401, 402, 228 N.Y.S.2d 111 (Sup Ct, N.Y. County 1962), aff'd, 18 A.D.2d 967, 237 N.Y.S.2d 989 (1st Dept 1963). The purpose of the reasonable time rule is to give plaintiff time to make decisions such as whether to repurchase securities. *Phillips v. Bank of Athens Trust Co.,* 202 Misc. 698, 702, 119 N.Y.S.2d 47 (Sup Ct, N.Y. County 1952).

What is a reasonable period of time? The period has ranged from one to four weeks after learning of the alleged fraud depending on the circumstances of the case. *Mitchell v. Texas Gulf Sulphur Co.,* 446 F.2d 90, 105 (10th Cir.1071)(9 days after date on which a diligent and reasonable investor would have been informed of April 16, corrected press release), cert. denied, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971); *Phillips, supra* at 703, 119 N.Y.S.2d 47 (7 days after plaintiff notified defendant of his objections to the sale of his securities. "[Plaintiff's] delay and decision to do nothing was occasioned by his determination to speculate on the continued rise of the market. Such speculation at the expense of the defendant cannot be condoned by the court."); *Newman v. Smith,* 1975 WL 389 at \*4, 1975 U.S.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

15 Misc.3d 1127(A)                                                                 Page 12
15 Misc.3d 1127(A), 841 N.Y.S.2d 222, 2007 WL 1238596 (N.Y.Sup.), 2007 N.Y. Slip Op. 50880(U)
**(Table, Text in WESTLAW), Unreported Disposition**

Dist. LEXIS 12686, Fed. Sec. L. Rep. (CCH) P95,078 (S.D.N.Y.1975)(17 days after notice of unauthorized sale of stock); *Halifax Fund LP v. MRV Communications Inc.,* No. 00 CIV 4878 HB, 2001 WL 1622261, 2001 U.S. Dist. LEXIS 20933 (S.D.N.Y.2001) (3 weeks from notice of unauthorized sale to cover), affm'd, 54 Fed. Appx. 718, 2003 U.S.App. LEXIS 78, 2003 WL 151257 (2d Cir.2003). Plaintiff's projection to 2009 is too far into the future, far too speculative, and not reasonable.

**\*13** Plaintiff challenges whether the market price is an accurate reflection of value since the market for seats on the NYSE was small and inefficient. Plaintiff relies on the NYSE's acting Chairman's announcement on November 9, 2005 that the "imputed value" of NYSE seats was $4.5 million when the seats were trading for $3 million. Plaintiff also relies on *Scalp & Blade, Inc. v. Advest Inc.,* 309 A.D.2d 219, 765 N.Y.S.2d 92 (4th Dept 2003) for the proposition that this Court may not limit plaintiff's proof of damages on a motion in limine.

In *Scalp & Blade,* a churning case, the lower court limited damages to the difference in value from the beginning of defendants control of the account and when defendants were removed from control of the account. *Id.* The Appellate Division reversed holding that plaintiffs could measure damages using a market index such as the S & P 500 to adjust for gains which may have occurred if the defendant had not been churning the account. *Id.* However, the time period remained the same.

This Court rejects plaintiff's procedural argument that defendants' motion is a disguised motion for summary judgment. Rather, a motion in limine is the appropriate vehicle to determine what evidence may be presented at trial regarding damages. *State v. Metz,* 241 A.D.2d 192, 198, 671 N.Y.S.2d 79 (1st Dept 1998).

This case also differs from *Scalp & Blade* in one significant way; in a churning case, the time period during which the market index is applied is fixed as

the time during which defendant was in control of the account and churning it. Here, the time period for the calculation of damages is not fixed. Accordingly, the legal authority on this issue holds that a reasonable time is to be used.

Plaintiff's damages should be measured by the reaction of the market for NYSE seats within a reasonable time after the merger announcement. *Affiliated Ute Citizens of the State of Utah v. United States,* 406 U.S. 128, 155, 92 S.Ct. 1456, 31 L.Ed.2d 741 (plaintiffs should be awarded, not the future value of their investments if they had decided not to sell them at all, but the difference between what they actually received and the fair value of their investment at the time of their sale), rehearing denied 407 U.S. 916, 92 S.Ct. 2430, 32 L.Ed.2d 692 (1972).*See also Gelb, supra.*Assuming the parties cannot agree to a reasonable period, it will be determined by the jury. The parties are welcome to offer experts to testify why one value or time period is more accurate than another. "[I]nferences may be drawn from surrounding circumstances as to the period of time which is reasonable for the ascertainment of damages." *Phillips v. Bank of Athens Trust Co.,* 202 Misc. 698, 702, 119 N.Y.S.2d 47 (Sup Ct, N.Y. County 1952). However, the time period will be a reasonable one and in no case shall it extend beyond 60 days from the announcement. In 60 days or less, plaintiff would have had sufficient time to decide whether to re-purchase a seat and seek financing if necessary. Further, as in *Scalp & Blade,* plaintiff may convince the jury that the market price, within the 60 day period after the merger announcement, was not an accurate reflection of a seat's value and thus that a multiple should be applied to the market price.

**\*14** Therefore, defendants' motion is granted.

*Motion for Preliminary Injunction*

The trial of this action was scheduled to begin on January 31, 2007.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

15 Misc.3d 1127(A)                                                      Page 13
15 Misc.3d 1127(A), 841 N.Y.S.2d 222, 2007 WL 1238596 (N.Y.Sup.), 2007 N.Y. Slip Op. 50880(U)
**(Table, Text in WESTLAW), Unreported Disposition**

On January 18, 2007, Mr. Krum was quoted in an article in the New York Post entitled "Traders Back Suit, Claim Thain Misled."The article was accompanied by a picture of Mr. Wey in front of the New York Stock Exchange. The reporter states in the article that he reviewed a document with Mr. Thain's schedule and notes. We now know that document referred to in the article is plaintiff's Exhibit 39, "Floor Member Breakfast Meeting: 8:00 am-Room 630: Tuesday, February 15, 2005," bearing Bates number W000266 or W00002. It is not contradicted that defendants had marked it "confidential" pursuant to this Court's approved confidentiality agreement. At the argument on the motion on January 29, 2007, Mr. Krum admitted his mistake in showing the confidential document to the reporter.

Mr. Thain argues that Mr. Krum violated the disciplinary rules by speaking to the press and giving the reporter a confidential document. DR 7-107, 22 NYCRR 1200.38 provides:

(a) A lawyer participating in or associated with a criminal or civil matter, or associated in a law firm or government agency with a lawyer participating in or associated with a criminal or civil matter, shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding in that matter. Notwithstanding the foregoing, a lawyer may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client. A statement so made shall be limited to such information as is necessary to mitigate the recent adverse publicity.(b) A statement ordinarily is likely to prejudice materially an adjudicative proceeding when it refers to a civil matter triable to a jury, a criminal matter, or any other proceeding that could result in incarceration, and the statement relates to:(1) The character, credibility,

reputation or criminal record of a party, suspect in a criminal investigation or witness, or the identity of a witness, or the expected testimony of a party or witness.

Defendants argue that disclosure of the document was a violation of the confidentiality agreement executed on February 24, 2006.

Mr. Krum submitted an affidavit in opposition setting forth his pedigree, but not addressing the motion. At argument, he explained on the record that he spoke to the N.Y. Post reporter who had called him after receiving from the New York Stock Exchange by e-mail on January 17, 2007 a copy of the NYSE brief on its motion for summary judgment, which had been served on plaintiff on January 12, 2007, as well as filed in the court. Mr. Krum read to the court his response to the reporter which was: "It is my opinion that when the trial starts in two weeks, the evidence that the plaintiff offers will establish that the head of the New York Stock Exchange refuses to accept responsibility for his actions and continues to cover up his own false statements and misleading half truths."

**\*15** As a consequence, this Court adjourned the trial of this matter until September 12, 2007 to ensure that the article would not prejudice the parties at trial. The parties were also directed to forego gratuitous remarks to the press, though remarks consistent with DR 7-107 would be allowed.

The remaining question is whether any further steps need be taken to protect this proceeding from the effects of the article or disclosure of a confidential document and whether there has been a violation of the disciplinary rules.

"Trial courts have broad power to regulate discovery to prevent abuse' [citation omitted]. When the disclosure process is used to harass or unduly burden a party, a protective order eliminating that abuse is necessary and proper' [citation omitted]. Courts are empowered to limit press and public access to court proceedings to maintain order and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

15 Misc.3d 1127(A)                                                                                        Page 14
15 Misc.3d 1127(A), 841 N.Y.S.2d 222, 2007 WL 1238596 (N.Y.Sup.), 2007 N.Y. Slip Op. 50880(U)
**(Table, Text in WESTLAW), Unreported Disposition**

decorum and to protect the rights of parties and witnesses."

*In Nicholson v. Luce,* NYLJ, Nov. 9, 2006, at 22 (Sup Ct, N.Y. County 2006), the court sanctioned an attorney under DR 7-107 for his statements to the press. The attorney commented on plaintiff's claims and the probative value of a letter disclosed at a deposition. He also disseminated the deposition transcript to the press. The sanction included: (1) enjoining the public disclosure and dissemination of any discovery material that is not required to be filed with the court; (2) enjoining the attorney from further violation of DR 7-107; and (3) imposing the cost of bringing the application for relief from the violative statements and actions, including attorneys' fees.

Here, it appears that the NYSE, not Mr. Thain, sent its summary judgment brief to the N.Y. Post. When the N.Y. Post called Mr. Krum for comment, he did not respond to the brief, but made a gratuitous statement concerning Mr. Thain. Admittedly, Mr. Krum showed a confidential document to the N.Y. Post reporter. It does not appear that a copy of the confidential document was given to the reporter. If it was, then Mr. Krum is directed to retrieve it immediately. Otherwise, there appears to be no need for further action as the delay of the trial and prohibition against further unnecessary statements squarely deals with the problem of influencing the jury pool.

Accordingly, it is

ORDERED that defendants' motion for summary judgment dismissing the complaint as to count two is granted and negligent misrepresentation is dismissed; and it is further

ORDERED, that the motion to dismiss the fraud and breach of fiduciary duty claims is denied except that the motion is held in abeyance as to the *in pari delicto* defense. The parties are instructed to brief the issue within thirty days after service of this order with notice of entry. The parties are to simultaneously exchange briefs solely addressing the *in pari delicto* defense. Replies shall be exchanged thirty days thereafter. The parties shall deliver copies of their briefs to the Court's part clerk, Room 238 and call the part clerk to schedule a mutually agreeable date and time for argument; and it is further

**\*16** ORDERED, that the claims for breach of fiduciary duty and negligent misrepresentation are dismissed against the NYSE; and it is further

ORDERED, that defendants' motion 03 to limit plaintiff's damages evidence at trial is granted; and it is further

ORDERED, that defendants' motion 05 is granted to the extent that the trial is adjourned to September 12, 2007 and Mr. Krum is directed to retrieve the confidential document from the N.Y. Post reporter if it was given to the reporter. All parties are directed to comply with all disciplinary rules. In particular, the parties shall comply with DR 7-107.

N.Y.Sup.,2007.
Wey v. New York Stock Exchange, Inc.
15 Misc.3d 1127(A), 841 N.Y.S.2d 222, 2007 WL 1238596 (N.Y.Sup.), 2007 N.Y. Slip Op. 50880(U)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.